**WELSH MANUFACTURING, DIVISION OF TEXTRON, INC.**

v.

*PINKERTON'S, INC.*

**No. 80–442–Appeal.**

Supreme Court of Rhode Island.

March 9, 1984.

Kenneth P. Borden, Higgins, Cavanagh & Cooney, Providence, for plaintiff.

Raymond A. LaFazia, Gunning, LaFazia & Gnys, Inc., Providence, for defendant; Patricia Ryan Recupero, Providence, of counsel.

## OPINION

KELLEHER, Justice.

This is an action for negligence wherein the plaintiff, Welsh Manufacturing (Welsh), brought suit against a security guard company, Pinkerton's, Inc. (Pinkerton's), for losses sustained as a result of three major thefts. Welsh claimed that Pinkerton's was negligent in the hiring, training, supervision, or assignment of a guard who was later found to have been a co-conspirator in connection with the Welsh thefts and that such negligence was the proximate cause of its losses. A Superior Court jury returned a verdict in favor of Welsh, judgment was rendered in accordance therewith, and Pinkerton's now appeals.

On appeal, Pinkerton's contends that there was insufficient evidence relative to each theory of liability to warrant their individual submission to the jury. Additionally, it challenges the propriety of the trial court's refusal to grant its motion for a new trial. We affirm the judgment of the Superior Court.

Pinkerton's is a long-established security service-corporation serving Rhode Island and neighboring areas of Massachusetts. It was engaged by Welsh for approximately thirty years to provide for the security of Welsh's manufacturing facility, which in 1973 was located in the Olneyville section of Providence. Welsh, a division of Textron, manufactured gold sunglass frames for the United States government. The Welsh complex consisted of two buildings, one across the street from the other. There were always sizable quantities of gold on the Welsh premises, and Pinkerton's agents were aware of this fact.

Under the contract between the parties, Pinkerton's assessed the security requirements of Welsh's premises and daily provided one uniformed and unarmed security officer therein for twenty-four hours. During the night shift, that is, approximately midnight to early morning, the guard was required to make periodic checks of all floors in the complex, registering his presence at designated locations. Between August 24, 1973, and October 7, 1973—a span of about forty-five days—three thefts at Welsh's facility resulted in losses of gold in excess of $200,000. All three thefts were carried out by the same persons. The first two incidents occurred while Pinkerton's employee, Donald Lawson (Lawson), was guarding Welsh's facility during the night shift. On both of these occasions, Lawson admitted the perpetrators of the thefts. At the time of the third theft, Lawson had quit working for Pinkerton's, but he testified later that he had provided vital information to parties who subsequently, on the Saturday evening of the 1973 Columbus Day weekend, broke into Welsh's plant, put a gun to the head of the Pinkerton guard on duty, handcuffed him to a nearby machine, and "cleaned out" Welsh's gold inventory, which had a value of close to $180,000.

Lawson was a twenty-one-year-old part-time employee who worked for Pinkerton's on weekends. During the time of the Welsh thefts he had been employed by Pinkerton's for less than six months. He was at this same time a member of the United States Navy. In July 1972 he had been transferred to Quonset Point Naval Air Station in North Kingstown, Rhode Island, and thereafter took up residence in a West Warwick apartment building. The jury heard Lawson's deposition, which revealed that after having made the acquaintance of the occupant of the adjoining apartment, one Anthony Fiore, a person with known criminal proclivity, Lawson had agreed to procure a security-guard position at Pinkerton's for the purpose of assisting the neighbor in stealing the valuable commodities stored on premises to which he might be assigned. In return, Lawson too would share in the fruits of such thefts. Accordingly, Lawson had applied to Pinkerton's in March 1973, and in alleged violation of what Welsh claimed at trial to be a duty to make a reasonable investigation, Pinkerton's hired him.

■ We consider briefly the principles of law involved in the action before us. In deciding this case, we align ourselves with the majority of jurisdictions that recognize the direct liability of an employer to third parties who are injured by acts of unfit, incompetent, or unsuitable employees.[1] Illustrative of these are *Ponticas v. K.M.S. Investments,* 331 N.W.2d 907 (Minn.1983), and *C.K. Security Systems, Inc. v. Hartford Accident & Indemnity Co.,* 137 Ga. App. 159, 223 S.E.2d 453 (1976). In *Ponticas,* a tenant who was sexually assaulted by the manager of her apartment complex brought suit against the owner of the complex. The tenant alleged that the owner

---

1. *See, e.g., McGuire v. Arizona Protection Agency,* 125 Ariz. 380, 609 P.2d 1080 (App.1980); *C.K. Sec. Systems, Inc. v. Hartford Accident & Indemnity Co.,* 137 Ga.App. 159, 223 S.E.2d 453 (1976); *Evans v. Morsell,* 284 Md. 160, 395 A.2d 480 (1978); *Hersh v. Kentfield Builders, Inc.,* 385 Mich. 410, 189 N.W.2d 286 (1971); *Ponticas v. K.M.S. Investments,* 331 N.W.2d 907 (Minn. 1983); *Di Cosala v. Kay,* 91 N.J. 159, 450 A.2d 508 (1982); *F & T Co. v. Woods,* 92 N.M. 697, 594 P.2d 745 (1979).

was negligent in hiring the manager, who had a criminal record. On his application for the position, the manager had provided the names of two references, one without an address, the other without a phone number. When asked if he had ever been convicted of any crimes, he entered "traffic tickets." The owner of the complex did not investigate further. It was adduced at trial that, in fact, the two references were his mother and his sister and at the time of his application he was on parole following a conviction in California for burglary and receiving stolen goods. *Ponticas*, 331 N.W.2d at 909–10. The court stated that an employer has the duty to exercise ordinary care in hiring persons who, because of the nature of the employment, could present a threat of injury to members of the public. *Id.* at 911. The court further stated that the scope of an employer's preselection investigation is related to the degree of risk a potential employee poses to the third party but imposed no duty upon the employer to inquire into an applicant's criminal record. The *Ponticas* court found, however, that because the employment involved the manager's access to the apartment by use of a passkey, the scope of the owner's preselection investigation was not commensurate with the risks involved. *Id.* at 913.

In *C.K. Security Systems, Inc. v. Hartford Accident & Indemnity Co.*, 137 Ga. App. 159, 223 S.E.2d 453 (1976), a guard who had been furnished by a security company to a landlord pursuant to a contract entered the office of one of the landlord's tenants and stole a blank check. He made the check payable to himself for an amount representing a six to seven thousand dollar overdraft, forged the tenant's signature, and deposited the check in the guard's own account in another bank. The tenant's bank authorized payment, having failed to check the signature. The bank and its insurer brought an action against the security company and its employee, claiming that the company had negligently hired its guard. In support of its motion for summary judgment, the guard's employer of-

fered an affidavit showing the following: the guard had passed a personnel test with a high grade; he had been granted a permit to serve as a guard by the local police department; the security company had contacted the guard's prior employers; the guard had passed a criminology course. There was evidence that the police department in granting its permits only inquired into felony convictions. The court, in affirming the trial justice's denial of the motion, held that the evidence did not demand a finding that the company had exercised ordinary care in its selection of the guard. *Id.* at 159–63, 223 S.E.2d at 454–56. The court stated:

> "The defendant was offering a security service and the use of its employees to patrol the premises for the purpose of protecting persons and property. In the selection of its employees it may have been duty bound to exercise a greater amount of care to ascertain its employees were honest and were not likely to commit thefts, where one employing others to perform a different type of service may meet the standard of care required with a lesser amount or quantum of care." *Id.* at 161–62, 223 S.E.2d at 455.

■ The action before us is distinguishable from that which arises under the doctrine of "respondeat superior" where the wrongful conduct of the employee is attributable to the master vicariously. Indeed, an action for negligent hiring provides a remedy to injured third parties who would otherwise be foreclosed from recovery under the master-servant doctrine since the wrongful acts of employees in these cases are likely to be outside the scope of employment or not in furtherance of the master's business. *See Di Cosala v. Kay*, 91 N.J. 159, 173, 450 A.2d 508, 515 (1982).

In *Di Cosala* the Supreme Court of New Jersey expressed this distinction aptly:

> "The tort of negligent hiring or failure to fire addresses a different wrong from that sought to be redressed by the *re-*

*spondeat superior* doctrine. One court has stated that:

'One dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the wilfull act of the employee beyond the scope of his employment. [*Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C.Mun.App.1951) ].'

"Thus, the tort of negligent hiring addresses the risk created by exposing members of the public to a potentially dangerous [or dishonest] individual, while the doctrine of *respondeat superior* is based on the theory that the employee is the agent or is acting for the employer. Therefore the scope of employment limitation on liability which is a part of the *respondeat superior* doctrine is not implicit in the wrong of negligent hiring." *Id.* 91 N.J. at 172–73, 450 A.2d at 515.

■ Our recognition of direct employer liability for its negligence is consistent with § 213 of the Restatement (Second) *Agency* (1958):

"A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: * * * (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others." 1 Restatement (Second) *Agency* § 213 at 458 (1958.)

Furthermore, our reasoning that the employer may be directly liable for wrongful acts of its negligently hired employee comports with the general tort principles of negligence long espoused by this court. Although the facts of this case present a question of first impression in this jurisdiction, we do not view this case as presenting a novel concept in our negligence law; rather, we see it as an application of the standard of due and reasonable care under the same or similar circumstances. *See Leonard v. Bartle*, 48 R.I. 101, 104–05, 135 A. 853, 854 (1927). Liability of the employer is premised on its failure to exercise reasonable care in selecting a person who the employer knew or should have known was unfit or incompetent for the employment, thereby exposing third parties to an unreasonable risk of harm. *See McGuire v. Arizona Protection Agency*, 125 Ariz. at 382, 609 P.2d at 1082; *Ponticas v. K.M.S. Investments*, 331 N.W.2d at 911; *Di Cosala v. Kay*, 91 N.J. at 173, 450 A.2d at 516.

■ The initial considerations in every negligence action are the determination whether there is a duty running from a defendant to a plaintiff and the definition of the scope of that duty. A duty of care may arise by virtue of a relationship created or existing between a plaintiff and a defendant. In this case, the relationship was a contractual one, wherein Pinkerton's agreed to provide security-guard services to Welsh for a consideration. Accordingly, we find that arising out of that relationship was Pinkerton's duty to Welsh to exercise reasonable care in selecting an employee who, as far as could be reasonably known, was competent and fit for the task of guarding the Welsh facility. This duty included Pinkerton's obligation to conduct a reasonable investigation into Lawson's work experience, background, character, and qualifications.

■ We have held that the standard of ordinary care does not vary; "[i]t is a question of degree only." *Leonard v. Bartle*, 48 R.I. at 104, 135 A. at 854. The greater the risk of harm, the higher the degree of care necessary to constitute ordinary care. *Id.* at 104, 135 A. at 854. *See Lawton v. Vadenais*, 84 R.I. 116, 121, 122 A.2d 138, 141 (1956). In the instant case, the risk of harm to clients like Welsh was a significant loss of property, and Pinkerton's was hired to protect against that risk. Pinkerton's was offering a service the very essence of which required honest, trustworthy, and

reliable personnel. The sensitive nature of the employment, coupled with the opportunity and temptations incident to it, would lead to the conclusion that a prudent employer in these circumstances should rely on more than the absence of specific evidence or statements that a potential employee is dishonest or criminally inclined. We believe that a reasonable investigation would call for affirmative statements attesting to an applicant's honesty, trustworthiness, and reliability and perhaps also require the disclosure of the basis upon which the recommending person has relied. Realizing that job applicants generally provide references who are certain to produce favorable reports, we think that background checks in these circumstances should seek relevant information that might not otherwise be uncovered. When an employee is being hired for a sensitive occupation, mere lack of negative evidence may not be sufficient to discharge the obligation of reasonable care. Section 302B, part D, of the Restatement (Second) of *Torts* (1965) states that an actor must take precautions:

> "[W]here the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct."
> 2 Restatement (Second) *Torts* § 302B (D) at 91.

Whether an employer exercises the quantum of care required is ordinarily a jury question.

An employer's duty does not terminate once an applicant is selected for hire. Other courts have stated that an employer has a duty to retain in its service only those employees who are fit and competent. *E.g., Ponticas v. K.M.S. Investments,* 331 N.W.2d at 911; *Di Cosala v. Kay,* 91 N.J. at 518, 450 A.2d at 518. We agree. At trial, Welsh proceeded on three additional theories of Pinkerton's liability: negligent supervision, negligent training, and negligent assignment. Pursuant to its broad duty to retain suitable and competent employees, we conclude that Pinkerton's owed Welsh a duty to exercise due and reasonable care in the preparation and assignment of its security officers for the sensitive task of guarding large quantities of gold.

At the close of all the evidence, Pinkerton's moved for a directed verdict, which the trial justice denied. The court charged the jurors that Welsh was seeking to prove Pinkerton's negligence in the hiring, the training, the supervision, or the assignment of its guard, Lawson. He instructed them that if they found that Pinkerton's failed to exercise reasonable care in any one of these areas, they could find for Welsh, provided the negligence was the proximate cause of Welsh's losses. The jury returned a general verdict in favor of Welsh with no special findings to indicate the theory or theories upon which it relied.[2] Consequently, we must test each theory separately to determine whether sufficient evidence was adduced at trial to warrant its submission to the jury. *Davis v. Caldwell,* 54 N.Y.2d 176, 178, 429 N.E.2d 741, 742, 445 N.Y.S.2d 63, 64 (1981). The *Davis* court held:

> "When multiple theories of liability have been submitted to a jury which is instructed to return a general verdict only, a judgment entered on such a verdict in favor of the plaintiff must be reversed when the proof was insufficient

---

**2.** Interrogatories were submitted to the jury, the first of which reads in pertinent part as follows:

> "Was the defendant PINKERTON'S, INC. guilty of any negligence either in the investigation of DONALD LAWSON, in his employment; or in his training, supervision or assignment, which negligence was a proximate cause of the plaintiff's loss of:

| | |
|---|---|
| (a) August 1973 | YES_____ |
| | NO_____ |
| (b) September 1973 | YES_____ |
| | NO_____ |
| (c) October 1973 | YES_____ |
| | NO_____" |

The jury answered each question in the affirmative.

for submission as to one or more of those theories." *Id.*

*See also Reynolds v. Missler*, 79 R.I. 89, 91, 83 A.2d 914, 915 (1951).

 In conducting this examination, we must, as must a trial justice in passing upon a motion for directed verdict, view the evidence in the light most favorable to the plaintiff and, without weighing the evidence or considering the credibility of witnesses, draw all reasonable favorable inferences therefrom. And if by so doing we find that there exist factual issues upon which reasonable minds could differ, we must sustain the decision of the trial justice. *Montuori v. Narragansett Electric Co.*, R.I., 418 A.2d 5, 9 (1980); *Geremia v. Benny's, Inc.*, 119 R.I. 868, 871–72, 383 A.2d 1332, 1334 (1978); *Evans v. Liguori*, 118 R.I. 389, 394, 374 A.2d 774, 776 (1977). We shall consider each theory of liability and analyze the evidence in respect to each.

## NEGLIGENT HIRING

We conclude that a rational trier of fact could infer that Pinkerton's had failed to exercise due and reasonable care in hiring Lawson for the purpose of assigning him to guard such a valuable commodity as the gold possessed by Welsh. Pinkerton's preselection process in hiring Lawson was as follows. Lawson filled out a general application form calling for, among other things, the names of his former employers and three persons who had known him for more than five years. Pinkerton's did not contact the three character references. Instead, it forwarded reference forms to Lawson's high school principal and to the Rhode Island Hospital, where Lawson had worked as an emergency room technician for approximately one month. The reference forms consisted of one question that asked whether the person queried could recommend the applicant without reservation and a request for any adverse comments on aspects of Lawson's character.[3] The high school principal commented that Lawson possessed many of the qualifications for Pinkerton's work, stating that his average academic ability would be an asset in following directions and taking orders from his superiors. The comments did not address matters pertaining to Lawson's honesty and trustworthiness. Rhode Island Hospital attached an employment-termination form wherein his supervisor rated Lawson as follows: "Average" for (*a*) ability to work under supervision, (*b*) manners with public, and (*c*) attitude toward work; "Good" for (*a*) quality of work, (*b*) ability to work with co-workers, (*c*) honesty,[4] and (*d*) appearance; and "Poor" in attendance. In the space provided for comments, the supervisor remarked that on two occasions Lawson had failed to report to work; and in response to the single question about recommending Lawson without reservation, the supervisor entered "see attached", referring to its aforementioned form. Pinkerton's also phoned a person who Lawson indicated was his superior officer in the Navy. He responded that he would recommend Lawson for the Pinkerton's job. Testimony showed that this man had been Lawson's superior officer for about two months. Pinkerton's requested Lawson's authorization for release of any police records. It requested those records from the State of Rhode Island, which reported that Lawson had no criminal record. Pinkerton's did not conduct any further background check. We think that Pinkerton's cursory investigation prior to Lawson's em-

---

3. Pinkerton's reference form read in part:
 "Please use the reverse side of this letter to inform us of any known inaccuracies in the above statement, and tell us of any adverse comment in connection with his honesty, character, domestic life, integrity, financial status, ambition, health, mentality, sobriety, agreeableness, or any other adverse characteristic of which you may be aware. If you prefer to indicate adverse comments by phone, please feel free to contact me."

4. A jury might well consider this evaluation of Lawson as it relates to his employment as a technician and measure its significance against the temptations and opportunities inherent in the guarding of gold.

ployment provided it with little current intelligence on him and could well support an inference of negligence in hiring for such a sensitive assignment as the guarding of gold. Therefore, Welsh's claim of negligent hiring was properly one for the jury's consideration.

## TRAINING AND SUPERVISION

We find that proof was sufficient to submit these theories to the jury. There was evidence in the case that Pinkerton's did not have a training program of a formal and inculcative nature to which Lawson was subjected prior to his first assignment. There was evidence, however, that Lawson was assigned to various duties of low-level responsibility at other establishments before his assignment to Welsh. There was testimony also that Pinkerton's had a policy whereby supervising officers made unannounced checks of its guards once a week for each shift. From this evidence, reasonable minds could infer that preparation for a task involving grave temptations toward dishonesty, such as the Welsh assignment, was a function of on-the-job training combined with Pinkerton's supervision of its employee in ascending levels of responsibility over a period of time. Thus, training and supervision in these circumstances could well be viewed simply as two aspects of a single concept under the facts of this case. The record shows that Lawson had no prior work experience of the type involved in Pinkerton's business. Lawson's assignments prior to guarding the Welsh complex do not evidence ascending levels of sensitivity. Moreover, notwithstanding Pinkerton's policy of surprise checks, there was testimony that the checks were rarely conducted on weekends when Lawson usually worked, and Lawson could not recall ever having been supervised. In addition, there was evidence that at least one supervisor in the course of these earlier duties had reason to suspect Lawson of "having sticky fingers" in rela-

tion to a theft of proceeds of a vending machine. Although this suspicion fell short of probable cause, it was a factor that should have been considered under reasonable standards of supervision prior to assigning Lawson to the guarding of such a commodity as gold. Evidence in the case indicates that this suspicion was not so considered by Pinkerton's in accordance with those reasonable standards prior to Lawson's assignment to Welsh. In the face of such proof, the trial justice did not err in declining to direct a verdict in regard to training and supervision.

## ASSIGNMENT

In respect to this theory, the evidence is more than ample to survive a motion for directed verdict. Lawson had been hired after a cursory investigation. He had been employed by Pinkerton's for approximately six months. During that time he had been assigned to no duties that would affirmatively demonstrate his reliability and honesty, save possibly a short assignment at United Wire, a metals plant, during which his supervisor became suspicious of him as the result of the vending-machine incident. Despite the lack of a positive record of honesty and despite the suspicion, although founded on less than probable cause, Pinkerton's assigned this relatively new and untried employee to safeguard a valuable quantity of gold. A rational trier of fact might certainly infer that the Welsh assignment was premature for this employee and, further, that it did not comport with the reasonable standard of care required to protect a client's interest under such circumstances. The trial justice was certainly correct in declining to direct a verdict on this theory of liability.

We hold, therefore, that all theories of liability were appropriately submitted to the jurors for their consideration and determination.[5]

---

**5.** We take this opportunity to highlight the value of requesting special findings. If a jury has made special findings, it may be unnecessary

for this court to reverse a judgment, even in the event that it may find insufficient evidence to support one or more of the alternative theories,

Pinkerton's challenges the propriety of the trial justice's submission of the issue of proximate cause to the jury. This challenge would relate to all alternative theories of negligence and is based upon Pinkerton's assertion that Lawson's criminal intervening act broke the chain of causation. We reject this challenge. We have enunciated the test for proximate cause in terms of foreseeability.

"[T]he test in these cases must be whether the intervening act could reasonably have been foreseen as a natural and probable result of the original act of negligence of the defendant." *Aldcroft v. Fidelity & Casualty Co. of New York,* 106 R.I. 311, 314, 259 A.2d 408, 411 (1969).

We are of the opinion that Lawson's succumbing to temptation and his participation in the criminal thefts might be found by a rational trier of fact to be a reasonably foreseeable result of Pinkerton's negligence in taking reasonable steps to assure its employee's honesty, trustworthiness, and reliability. When considering foreseeability in respect to the issue of proximate cause, this court observed in a somewhat analogous case that "[i]t was for the jury to determine what dangers a racetrack operator should have perceived and what precautions and safeguards it should have taken for the benefit of its paying patrons * * *." *Cofone v. Narragansett Racing Association, Inc.,* 103 R.I. 345, 353, 237 A.2d 717, 722 (1968). In the case at bar it was similarly for the jury to determine what dangers, including criminal conduct, Pinkerton's should have perceived and what precautions and safeguards it should have taken for the benefit of its client, from whom it received a fee for the purchase of security. This foreseeability would be as applicable to the $180,000 robbery, by which time Lawson had ceased to work for Pinkerton's, as to the earlier thefts since Lawson later admitted to furnishing the robber with information helpful

as was required in *Davis v. Caldwell,* 54 N.Y.2d 176, 178, 429 N.E.2d 741, 742, 445 N.Y.S.2d 63,

to implementing the third crime. *See McGuire v. Arizona Protection Agency,* 125 Ariz. 380, 609 P.2d 1080 (App.1980).

We turn now to the issue of the trial justice's denial of Pinkerton's motion for new trial. In passing upon this motion, it would also be necessary that the trial justice exercise his independent judgment in evaluating the general verdict with respect to each theory of liability. In this instance the trial justice gave a comprehensive and detailed analysis of all the evidence. He did not expressly outline the evidence relative to each theory of liability, but he did reach an overall determination that there was sufficient evidence to support the verdict of the jury in respect to hiring, training and supervision, and assignment. Although he did not discuss training in this instance as a separate theory, we reiterate that under the evidence in this case, training and supervision are related aspects of the same theory, particularly in the absence of a formal training program. In his instructions to the jury and in his analysis of the evidence, the trial justice did not suggest that the absence of a formal training program was negligence per se. He correctly regarded training and supervision as constituting ascending levels of responsibility in the course of on-the-job observation and evaluation. We are of the opinion that such a view in light of all of the facts in the case was appropriate. We have reviewed the record and conclude that in considering the motion for new trial, the trial justice performed his duties in accordance with the requirements of *Barbato v. Epstein,* 97 R.I. 191, 193–94, 196 A.2d 836, 837 (1964), and its progeny. When the trial justice has adequately performed his function in passing upon a motion for new trial, the rule is well settled that we may not disturb his determination unless we find that he has misconceived or overlooked relevant evidence on a critical issue or was otherwise clearly wrong. *Mouchon v. Erikson's Inc.,* R.I., 448 A.2d 776, 778 (1982);

64 (1981). *See also Reynolds v. Missler,* 79 R.I. 89, 91, 83 A.2d 914, 915 (1951).

*Powers v. Carvalho,* 117 R.I. 519, 525, 368 A.2d 1242, 1246 (1977). A careful analysis of the evidence in this case convinces us that the trial justice did not overlook relevant evidence on any critical issue; nor was he otherwise clearly wrong. Consequently, we cannot fault his denial of Pinkerton's motion for new trial.

For the reasons stated, Pinkerton's appeal is denied and dismissed. The judgment of the Superior Court is affirmed, and the case is remanded to the Superior Court.

SHEA, J., did not participate.