Karen **RODRIGUES**

v.

The **MIRIAM HOSPITAL.**

No. 91–380–Appeal.

Supreme Court of Rhode Island.

April 20, 1993.

Mercedes Deines, Mark Decof, Decof & Grimm, Providence, for plaintiff.

C. Russell Bengston, Patricia Buckley, Carroll, Kelly & Murphy, Providence, for defendant.

## OPINION

FAY, Chief Justice.

This case comes before us on appeal by the plaintiff, Karen Rodrigues, from a judgment of the Superior Court granting the motion of the defendant, the Miriam Hospital (hospital), for a directed verdict and subsequent motion for a new trial. For the reasons stated herein, we affirm the judgment of the trial justice regarding the motion for a directed verdict. Because we uphold the directed verdict, we need not address the propriety of the conditional motion for a new trial.

The incident underlying this litigation occurred on October 12, 1984. Before commencing our review of the facts, however, we find it necessary to mention briefly plaintiff's complex medical history.

In 1984 plaintiff was twenty-four years of age. From about the age of nine she has periodically suffered from rheumatoid arthritis. The plaintiff additionally developed lupus around 1982. Prior to the incident in question, plaintiff had suffered

from such symptoms as headaches, numbness and tingling of the hands, anemia, renal failure, cognitive and memory problems, and difficulties with her balance. In October 1984 plaintiff's primary physicians were Dr. Alex Mandel, who had been treating her for lupus since October 1982, and Dr. Stephen Zipin, a nephrologist who had been treating her for related renal conditions since January 1984. According to Dr. Mandel, the symptoms listed above were associated with plaintiff's lupus.

The facts pertinent to this appeal are as follows. On October 12, 1984, plaintiff awoke with a sore throat. As the morning progressed, she developed difficulty in swallowing and she became short of breath. Shortly before noon plaintiff's father telephoned Dr. Mandel. Unable to reach Dr. Mandel, plaintiff's father contacted Dr. Zipin. Doctor Zipin, upon hearing of plaintiff's condition, advised plaintiff's father to take her to the hospital's emergency room. Doctor Zipin was scheduled to deliver a noontime lecture at the hospital and informed plaintiff that he would visit her at the emergency room at the conclusion of his lecture. On his way to the lecture hall, Dr. Zipin stopped at the emergency room to supply the staff with plaintiff's medical records and to inform them of her impending arrival.

The plaintiff arrived at the emergency room at 12:30 p.m. Within a few minutes of her arrival plaintiff was examined by Dr. Mitchell Basel, the emergency-room resident on duty. Doctor Basel quickly diagnosed plaintiff as suffering from epiglottitis, an inflammation of the flaplike tissue that prevents anything but air from entering the lungs. In an attempt to confirm this diagnosis, Dr. Basel ordered X rays and arranged for an intravenous line to administer fifteen milligrams (mg) of Decadron, an anti-inflammatory drug. He then reported his actions and findings to Dr. David Johnson, the emergency-room attending physician.

At approximately 1 p.m. Dr. Mandel arrived at the emergency room. According to Dr. Mandel, he was on his way to the medical records department when he happened to notice plaintiff sitting outside the x-ray room. After inquiring about plaintiff's condition, Dr. Mandel proceeded to countermand Dr. Basel's order to administer the Decadron in a 15–mg intravenous drip. Instead, Dr. Mandel injected plaintiff with 20 mgs of Decadron because he wanted the drug administered at a quicker pace and in a larger dose. Doctor Zipin, after completing his lecture at approximately 1:15 p.m., also stopped by to check on plaintiff's condition. Doctor Basel promptly reported his findings to both Dr. Mandel and Dr. Zipin.

After reviewing the X rays and confirming Dr. Basel's diagnosis of epiglottitis, the three physicians agreed that an ear, nose, and throat (ENT) specialist should examine plaintiff. Doctor Zipin suggested Dr. Steven Issenberg, an ENT specialist with staff privileges at the hospital, whom Dr. Zipin knew from residency training. Doctor Mandel was also familiar with Dr. Issenberg and agreed that he should be called. Doctor Issenberg arrived at the emergency room at 1:30 p.m. He examined plaintiff, diagnosed her condition as acute epiglottitis, and recommended an immediate tracheostomy. Despite requests by Dr. Mandel and Dr. Zipin, Dr. Issenberg refused to perform the tracheostomy, claiming that he had not performed the procedure in many years. After Dr. Mandel and Dr. Zipin made several unsuccessful attempts to locate another specialist, Dr. Mandel instructed an emergency-room nurse to find an available surgeon within the hospital. She located Dr. S. Frederick Slafsky, a surgeon in private practice who was assisting with another procedure in one of the hospital's operating rooms. Doctor Slafsky arrived at the emergency room at 1:45 p.m. Doctors Mandel and Zipin explained the situation to Dr. Slafsky, and he agreed to perform the tracheostomy. He then left to arrange for an operating room and to find an anesthesiologist to aid in the procedure.

A short time later Dr. Kathleen Hittner, an anesthesiologist in private practice, arrived in the emergency room and evaluated plaintiff for the impending operation. Doctor Zipin, assuming that everything was under control, left the hospital at approximately 2:10 p.m. Shortly thereafter Dr. Mandel left the emergency room and went across the hall to the medical records de-

partment. Meanwhile, while waiting for an operating room, plaintiff's condition worsened. At 2:44 p.m. plaintiff experienced severe respiratory distress and collapsed. Doctors Slafsky and Hittner were in an operating room waiting for plaintiff when a nurse called an emergency code requesting Dr. Slafsky to report to the emergency room. Doctors Slafsky and Hittner arrived in the emergency room within fifteen seconds of the call. Doctor Hittner observed plaintiff receiving oxygen and noted that she was slightly blue in color. Doctor Hittner assumed the administration of oxygen and made sure that plaintiff was not suffering from oxygen deprivation. In an attempt to secure an airway for her to breathe through, Dr. Hittner inserted a laryngoscope into plaintiff's mouth to determine if she could be intubated. Upon inserting the laryngoscope, Dr. Hittner encountered an abnormally large epiglottis that prevented her from inserting the endotracheal tube. Doctor Slafsky performed an emergency tracheostomy. The entire procedure lasted one to two minutes. Doctor Slafsky testified that, with the exception of the fifteen-second period Dr. Hittner attempted to intubate plaintiff, she was continually given oxygen from the time of her respiratory collapse until she began breathing on her own after the tracheostomy.

In February 1985 plaintiff filed a two-count complaint against the hospital. The plaintiff claims that during her respiratory failure she was deprived of oxygen long enough to have suffered permanent brain damage. Count 1 of plaintiff's complaint alleged that the hospital was vicariously liable for the negligent treatment and actions of its emergency-room personnel. Additionally plaintiff averred that Dr. Issenberg was an apparent agent of the hospital and, as such, his negligent refusal to perform the tracheostomy should be imputed to the hospital. Count 2, which plaintiff amended in February 1990, alleged a theory of corporate negligence against the hospital for its negligent renewal of Dr. Issenberg's staff privileges.

A jury trial commenced in May 1990 and lasted approximately six weeks. At the close of all the evidence, the hospital moved for a directed verdict on all counts. The trial justice reserved decision on the motion and sent the case to the jury. After deliberating for nearly two days, the jury made the following findings of fact: the emergency-room employees were negligent in their treatment of plaintiff, the hospital was negligent in renewing Dr. Issenberg's surgical-staff privileges, and these negligent acts proximately caused plaintiff's respiratory arrest and the resulting neurological deficits. The jury awarded plaintiff a verdict of $2,800,000 in damages and $1,908,200 in interest. The hospital renewed its motion for a directed verdict and moved for a new trial. On July 17, 1990, the trial justice heard oral arguments and rendered a lengthy bench decision granting both motions.

In granting the hospital's directed-verdict motion relative to plaintiff's respondeat superior claim, the trial justice ruled that the emergency-room staff was not negligent in treating plaintiff. He explained that there was sufficient consultation among the doctors and that, according to all the experts, it was appropriate to wait for an operating room rather than try to perform the tracheostomy in the emergency room. The trial justice further explained that there was no indication that a surgeon was available to perform the procedure any earlier. Moreover, the trial justice relied on the presence of plaintiff's two personal physicians and their assumption of responsibility in concluding that "as a matter of law, there's no reasonable judgment to be made that the O.R. [*sic*] people acted improperly in the context with Drs. Mandel and Zipin present in the situation." In addition the trial justice explained that no evidence existed to support a conclusion that Dr. Issenberg was an implied agent of the hospital. The trial justice noted that neither the hospital nor Dr. Issenberg represented Dr. Issenberg as an agent of the hospital. Doctor Issenberg was not consulted as an on-call physician of the hospital's ENT department. Rather Dr. Zipin and Dr. Mandel had contacted Dr. Issenberg because they were familiar with his reputation as an ENT specialist.

On the issue of corporate negligence the trial justice ruled that the hospital correctly

adhered to the guidelines established by the Miriam Hospital bylaws and the Joint Commission on the Accreditation of Hospitals for the renewal of Dr. Issenberg's staff privileges. Furthermore the trial justice indicated that plaintiff failed to show how a further investigation into Dr. Issenberg's clinical practice could have placed the hospital on notice that Dr. Issenberg might be incapable of performing or unwilling to perform a tracheostomy.

We now turn to an analysis of the trial justice's ruling with respect to each theory of liability.

## I

### RESPONDEAT SUPERIOR

■ In reviewing the trial justice's decision on a motion for a directed verdict, this court is bound by the same rules that govern the trial justice. We must examine all the evidence in the light most favorable to the nonmoving party without considering the weight of the evidence or the credibility of the witnesses. We must draw from that evidence only those reasonable inferences that support the position of the opposing party. *Gordon v. St. Joseph's Hospital*, 496 A.2d 132, 136 (R.I.1985). If such an examination reveals any evidence upon which reasonable minds could differ, then the motion for a directed verdict should be denied and the jury should be left to determine the issues of the case. *Id.*

The plaintiff claims that the trial justice failed to adhere to this rigid standard in granting the hospital's motion for a directed verdict. The plaintiff contends that when one views the evidence in the light most favorable to her, clear evidence exists that the emergency-room personnel breached the duty of care owed to her in the existing circumstances.

■ The initial considerations in every negligence action are whether there is a duty running from a defendant to a plaintiff and the definition of the scope of that duty. *Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's, Inc.*, 474 A.2d 436, 440 (R.I.1984). This court has continuously recognized that negligence law does not impose liability upon an individual unless there is a breach of duty owed to the plaintiff. *Ryan v. State, Department of Transportation*, 420 A.2d 841, 843 (R.I. 1980). "It is axiomatic to tort law that this duty goes to the very existence of liability. * * * One cannot logically be held liable for breach of a nonexistent duty." *Swajian v. General Motors Corp.*, 559 A.2d 1041, 1046 (R.I.1989). Therefore, before deciding if the hospital breached its duty to plaintiff, we must first determine whether the hospital did, in fact, owe plaintiff a duty of care.

■ The facts indicate that plaintiff arrived at the hospital's emergency room at 12:35 p.m. on October 12, 1984. At this time the emergency-room staff clearly owed plaintiff a duty to diagnose and treat her in accordance with accepted standards of medical care. *See Schenck v. Roger Williams General Hospital*, 119 R.I. 510, 515, 382 A.2d 514, 517 (1977). The plaintiff's expert conceded that Dr. Basel rendered an acceptable level of care from the time of plaintiff's presentment at the emergency room until the arrival of her two personal physicians at approximately 1 p.m. Thus, the central question before us is whether, after this point in time, the emergency-room personnel owed plaintiff a continuing duty that required them to reject the decisions made by plaintiff's physicians and impose alternative emergency procedures. The trial justice implied that "as a matter of law" the presence of plaintiff's primary physicians relieved the hospital of its duty owed to plaintiff prior to their arrival.

The plaintiff contends that the arrival of her primary physicians did not entirely relieve the hospital of its duty to provide her with competent emergency care. The plaintiff believes that the emergency-room staff should have intervened and arranged for an earlier tracheostomy or cricothyrotomy. The plaintiff asserts that the trial justice erred in summarily deciding this question as a matter of law. According to plaintiff, whether the hospital was relieved of its duty to treat plaintiff was a factual question for the jury to decide. We disagree.

■ This court has repeatedly stated that the existence and the extent of a duty of care are questions of law. *Palmisciano v. Burrillville Racing Association*, 603 A.2d 317, 320 (R.I.1992); *Mignone v. Fieldcrest Mills*, 556 A.2d 35, 37 (R.I.1989). "Whether there exists a duty of care running from the defendant to the plaintiff is, therefore, a question for the court and not for the jury." *Banks v. Bowen's Landing Corp.*, 522 A.2d 1222, 1224 (R.I.1987). "[O]nly whether such duty has been breached and whether proximate cause exits are the questions for the factfinder." *Mignone*, 556 A.2d at 37. We wish to note that it is often necessary for the trial justice to find preliminary facts in deciding questions of law. When finding such preliminary facts, the trial justice exercises his or her independent judgment and does not apply the directed-verdict standard.

■ Our review of the trial record reveals competent evidence supporting the trial justice's ruling that the hospital's duty was excused by the arrival of plaintiff's primary physicians. According to the hospital's Emergency Unit Policy and Procedure Manual, "emergency unit physicians will provide definitive emergency care * * * to all patients not identifying a private physician on the hospital staff." Doctor Steven Kempner, the hospital's emergency-unit director, testified that the role of the emergency-room unit is subordinated once the patient's primary physician assumes control of his patient. Doctor Thomas Gross, one of the unit's attending physicians in October 1984, also testified that once a patient's personal physician assumes the direction of care for his or her patient, the unit's duty is relegated to that of a supporting role. Additionally, Dr. Robert Woolard, director of Rhode Island Hospital's emergency department, concurred with the analyses of Dr. Kempner and Dr. Gross. According to Dr. Woolard, primary physicians assume responsibility for the care of their patients when they arrive at the emergency room.

The facts before us plainly indicate that plaintiff was under the definitive care of her own physicians once they arrived at the emergency room. When Dr. Mandel and Dr. Zipin arrived, Dr. Basel provided them with a full report of plaintiff's condition, including his diagnosis, the tests he had ordered, and the possibility that she might need a tracheostomy. After performing an independent examination, Dr. Mandel proceeded to countermand Dr. Basel's order relative to the administration of Decadron. In fact, Dr. Mandel himself injected plaintiff with the drug in the dosage that he deemed appropriate without the input or assistance of emergency-unit personnel. Moreover, after deciding that an ENT specialist should be consulted, it was Dr. Zipin and Dr. Mandel who selected Dr. Issenberg. This decision was made without consulting Dr. Basel or any other member of the emergency-unit staff. When Dr. Issenberg refused to perform the recommended tracheostomy, it was Dr. Mandel who instructed the emergency-unit nurse to locate an available surgeon within the hospital. After she located Dr. Slafsky, Dr. Mandel and Dr. Zipin consulted with him and requested that he perform the procedure. Again, neither the emergency unit's attending physician nor Dr. Basel participated in this decision.

Relying on these facts, we find that Dr. Mandel and Dr. Zipin had assumed responsibility for plaintiff's care. In doing so, the hospital was relieved of the duty it owed to plaintiff upon her presentment at the emergency room. We are of the opinion that the emergency-care unit could not have reasonably perceived any risk to plaintiff while her two primary physicians were providing her with exclusive care. *See Radigan v. W.J. Halloran Co.*, 97 R.I. 122, 196 A.2d 160 (1963); *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). Because we find that the hospital did not owe plaintiff a duty of care, the jury had nothing to consider. Accordingly we affirm the trial justice's granting of the hospital's motion for a directed verdict.

## II

## APPARENT AUTHORITY

We now turn to the question of whether the hospital should be held vicariously liable for the alleged negligence of Dr. Issenberg under the doctrine of apparent author-

ity. Even though Dr. Issenberg was an independent contractor and not an employee of the hospital, plaintiff asserts that he acted as an apparent agent of the hospital and, as such, his negligent refusal to perform the tracheostomy should be imputed to the hospital.

Although this court has previously recognized the doctrine of apparent authority in the context of contractual transactions, *see Calenda v. Allstate Insurance Co.,* 518 A.2d 624 (R.I.1986); *Petrone v. Davis,* 118 R.I. 261, 373 A.2d 485 (1977), this is the first time we have considered the applicability of the doctrine to medical-malpractice actions. The principles of apparent authority are set forth in the Restatement (Second) *Agency* § 267 (1958):

> "One who represents that another is his [or her] servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he [or she] were such."

■ Viewing the restatement in conjunction with prior Rhode Island case law, we believe that an individual must satisfy the following three criteria in order to sustain a medical-malpractice action against a hospital based on apparent authority. The patient must establish (1) that the hospital, or its agents, acted in a manner that would lead a reasonable person to conclude that the physician was an employee or agent of the hospital, (2) that the patient actually believed the physician was an agent or a servant of the hospital, and (3) that the patient thereby relied to his detriment upon the care and skill of the allegedly negligent physician. *See Soar v. National Football League Players' Association,* 438 F.Supp. 337, 342 (D.R.I.1975), *aff'd,* 550 F.2d 1287 (1st Cir.1977); *Calenda v. Allstate Insurance Co.,* 518 A.2d at 628; *Petrone v. Davis,* 118 R.I. at 265–66, 373 A.2d at 487–88.

■ After reviewing the transcript and drawing all reasonable inferences on plaintiff's behalf, we are of the opinion that Dr. Issenberg did not possess the apparent authority to bind the hospital on the afternoon of October 12, 1984. A thorough review of the record failed to uncover the slightest evidence that plaintiff was laboring under the actual belief that Dr. Issenberg was in any way connected to the hospital staff. The record was similarly devoid of any evidence that plaintiff ever relied upon the care and skill of Dr. Issenberg. The facts reveal that Dr. Mandel and Dr. Zipin did not contact Dr. Issenberg because of any connection he had with the hospital. Rather, Dr. Mandel and Dr. Zipin called Dr. Issenberg because they were familiar with his reputation as an ENT specialist. This decision was made solely by Dr. Mandel and Dr. Zipin. They did not confer with any member of the hospital staff, nor did they consult the hospital's on-call listing of ENT specialists. Moreover, plaintiff indicated in her interrogatories that Dr. Mandel had informed her that he was calling Dr. Issenberg because he was an ENT specialist.

We find that a reasonable person could not conclude that plaintiff was relying on the care and skill of Dr. Issenberg or that she was confused about Dr. Issenberg's status as an independent physician. For these reasons we affirm the trial justice's granting of the hospital's directed verdict on the issue of apparent authority.

### III

### CORPORATE NEGLIGENCE

■ Count 2 of plaintiff's complaint alleges a theory of corporate negligence against the hospital. The doctrine of corporate negligence imposes liability upon a hospital that has failed to exercise reasonable care in selecting or renewing the staff privileges of an unfit physician. Corporate negligence differs from the vicarious nature of respondeat superior in that it imposes on the hospital a nondelegable duty owed directly to the patient that is independent of the doctor-hospital relationship.

■ Although this court has not yet addressed the doctrine of corporate negligence, we have previously recognized an analogous cause of action known as "negligent hiring." In *Welsh Manufacturing,*

*Division of Textron, Inc., supra,* we ruled that a security-guard company could be held liable for the failure to exercise reasonable care in hiring one of its security guards. In so holding, the *Welsh* court stated that "our reasoning that the employer may be directly liable for wrongful acts of its negligently hired employee comports with the general torts principles of negligence long espoused by this court." 474 A.2d at 440. The court reasoned that "[l]iability of the employer is premised on its failure to exercise reasonable care in selecting a person who the employer knew or should have known was unfit or incompetent for the employment, thereby exposing third parties to an unreasonable risk of harm." *Id.* Because the corporate-negligence doctrine mirrors this reasoning, we deem it a natural progression to extend the negligent-hiring doctrine to the hospital setting. Accordingly we adopt the doctrine of corporate negligence as a theory of hospital liability in this jurisdiction.

We now turn to an examination of the procedures utilized by the hospital in renewing the staff privileges of Dr. Issenberg. According to Dr. Robert Hopkins, the individual primarily responsible for reviewing the privileges of staff physicians, each physician seeking reappointment in 1984 had to fill out an application for the renewal of staff privileges. The application solicited such information as whether any changes had occurred in the physical and mental health of the applicant, whether any adverse claims had been brought against the applicant, and whether the applicant's privileges had been reduced at other medical institutions. Doctor Hopkins reviewed Dr. Issenberg's application with Dr. Mendel Robinson, director of the hospital's otolaryngology department. After discussing Dr. Issenberg's application and qualifications, Dr. Hopkins and Dr. Robinson agreed to renew Dr. Issenberg's staff privileges. Following standard procedure, Dr. Hopkins mailed a letter to Dr. Issenberg notifying him of his staff privileges for the years July 1, 1984, through June 30,

1986. The letter listed twelve privileges accorded to Dr. Issenberg, one of which was the right to perform tracheotomies.[1] The letter also provided that "[i]f there are any additions or corrections in this list, please feel free to call upon [Dr. Hopkins] at any time." Dr. Issenberg accepted the delineated privileges by signing the following acknowledgment:

"I understand and accept the above to be my privileges as a member of The Miriam Hospital Active Staff, in the Department of Surgery, from July 1, 1984, through June 30, 1986."

Both Dr. Hopkins and Dr. Robinson testified that, other than the renewal-of-privileges application, they made no attempt to further investigate Dr. Issenberg's clinical activities. They admitted that the hospital's process of reappointing staff physicians revolved primarily around the honor system, wherein the applicants were expected to notify the hospital if they were no longer performing any of the listed procedures.

The plaintiff asserts that the reappointment procedure utilized by the hospital in 1984 did not conform with the standards delineated by the hospital bylaws. The relevant portion of the hospital's bylaws provides that

"Biennial re-appointment shall follow an appraisal of clinical activity, professional performance an[d] a re-assessment of the extent of clinical privileges to be granted." *Bylaws of the Miriam Hospital Staff Association,* art. I, B, sec. 2(e). The plaintiff avers that an in-depth appraisal of Dr. Issenberg's clinical activities would have revealed that Dr. Issenberg had not performed a tracheostomy in recent years. Armed with this information, plaintiff claims that the hospital could have reasonably inferred that Dr. Issenberg might be incapable of or might refuse to perform a tracheostomy. The plaintiff contends that, in viewing the evidence in the light most favorable to her, reasonable minds could conclude that the hospital was negligent in renewing Dr. Issenberg's staff

---

1. Although there are technical medical distinctions between the tracheostomy and the tracheotomy procedures, Dr. Robinson testified that these procedures are essentially the same. Doctor Robinson explained that the staff privileges afforded to Dr. Issenberg in June 1984 included the privilege to perform both tracheostomies and tracheotomies.

privileges based solely on the honor system. We disagree.

It is important to point out that before a hospital can be held liable under the theory of corporate negligence, "it is necessary to show that the hospital had actual or constructive knowledge of the defect * * * which created the harm." *Thompson v. Nason Hospital,* 527 Pa. 330, 341, 591 A.2d 703, 708 (1991); *see Fridena v. Evans,* 127 Ariz. 516, 519, 622 P.2d 463, 466 (1980). A hospital will be charged with constructive knowledge of any facts that it would have acquired if it had exercised the requisite care in renewing a physician's staff privileges. Thus, in the case at hand, plaintiff must show that the hospital would have discovered Dr. Issenberg's reluctance or inability to perform tracheostomies if it had performed the recommended and customary investigation into his previous clinical activities. Our review of the trial record leads us to conclude that plaintiff has not met this burden.

The plaintiff has failed to produce any evidence indicating that a further probe into Dr. Issenberg's clinical activities would have dissuaded the hospital from renewing his staff privileges. Even if Dr. Hopkins and Dr. Robinson had explored all available information regarding Dr. Issenberg's activities at the hospital and his activities at Roger Williams General Hospital, where he was chief of otolaryngology, there is nothing that would have put them on notice that Dr. Issenberg might refuse to perform a tracheostomy. There had been no complaints or adverse actions taken against Dr. Issenberg, nor had he refused to perform such a procedure in the past. We disagree with the plaintiff's assertion that, because Dr. Issenberg had not performed a tracheostomy in many years, Dr. Hopkins and Dr. Robinson could have reasonably inferred that Dr. Issenberg might be incapable of performing, or might refuse to perform, a tracheostomy. We find such an inference to be unreasonable. Physicians are trained to do a variety of procedures that they are not called upon to perform on

a regular basis. Simply because a physician has not performed a particular procedure within a certain, unspecified period does not support an inference that the physician is incapable of performing, or might refuse to perform, the procedure when requested. Accordingly we are of the opinion that information of Dr. Issenberg's lack of tracheostomy activity would not have adversely influenced the hospital's decision to renew Dr. Issenberg's staff privileges.

For all the above-stated reasons we affirm the trial justice's granting of the defendant's motion for a directed verdict. The plaintiff's appeal is hereby denied and dismissed, and the papers in the case are remanded to the Superior Court.