USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 95-1218 MARY E. FEDERICO, ETC., ET AL., Plaintiffs, Appellants, v. ORDER OF SAINT BENEDICT IN RHODE ISLAND, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ernest C. Torres, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Boudin and Stahl, Circuit Judges, ______________ ____________________ Dennis J. Roberts II for appellants. ____________________ Michael G. Sarli, with whom Gidley, Sarli & Marusak was on brief ________________ ________________________ for appellee. ____________________ August 29, 1995 ____________________ STAHL, Circuit Judge. After John Federico, Jr., STAHL, Circuit Judge. ______________ died at the defendant school, his parents brought this wrongful death action. Following a thirteen-day trial, the jury returned a verdict in favor of the defendant. On appeal, the principal issue is whether the district court misconceived the scope of the duty owed under Rhode Island law by a boarding school to one of its students. After careful review, we determine that there was no error and therefore affirm. I. I. __ FACTUAL AND PROCEDURAL BACKGROUND FACTUAL AND PROCEDURAL BACKGROUND _________________________________ John Federico, Jr. ("John"), was a sixteen-year-old boarding student at defendant Portsmouth Abbey School ("the school"). The school operated a full-time infirmary, staffed by the director of medical services, Pamela Gorman, R.N., and a licensed practical nurse. The school also retained, on a part-time basis, Dr. Robert Koterbay, a board-certified pediatrician, as school physician.  As a young child, doctors diagnosed John as asthmatic with a severe allergy to nuts. The school's medical staff knew about John's medical condition. John's father ("John Sr.") -- a pediatrician -- actively participated in John's medical care. John Sr. arranged for a Pulmo-Aid machine to be kept in John's room. However, John -2- 2 Sr. apparently rejected the advice of John's allergist that epinephrine1 in a self-administered form be immediately available to him.  The events underlying this case all took place on the evening of February 26, 1993. John's dorm parent, Stephen Carter, held an end-of-term party and ordered Chinese food from a local restaurant. Carter and his wife, Deidre, lived in an apartment attached to John's dormitory. John, who was known to be very careful about his diet, ate only broccoli and rice. The food did not appear to have nuts in it. At 9:30 p.m., the students were excused and instructed to return to the dorm at 10:00 p.m. for prayers. John went to an area behind the student center, used by students to smoke cigarettes. John remarked to another student that "I just don't feel well." John smoked one-half of a cigarette. At about 9:45 p.m., John returned to the dorm. At about 9:50 p.m., John knocked on the Carter's apartment door saying in a wheezy, high-pitched voice, "Hello -- help me -- I'm having an asthma attack." John was blue and breathing with difficulty. Mrs. Carter assisted him to the sofa of the apartment, and then called out "Emergency -- John Federico is having an asthma attack -- someone get his inhaler." Students came in with one or more inhalers. Mrs. Carter  ____________________ 1. Epinephrine (adrenaline) is used as a muscle relaxant. -3- 3 attempted to reach the infirmary on the telephone. The line was busy. Mr. Carter then arrived. He immediately went to the infirmary to get help.  Arriving at the infirmary, Mr. Carter told Nurse Gorman that John was having a severe asthma attack. Nurse Gorman took John's chart and an oxygen tank to the dorm. She did not take an emergency medical kit containing epinephrine and a syringe. She instructed another infirmary worker, Sister Frances (a licensed practical nurse), to call the rescue squad. However, Nurse Gorman did not tell Sister Frances to call Dr. Koterbay. Before Nurse Gorman arrived at the Carter apartment, another student brought the Pulmo-Aid machine to John, but John could not grab it. Brian Bordeau, a senior student prefect in John's dormitory, arrived in the Carter apartment at about 9:55 p.m. At this point, John was lying on a couch down with vomitus coming from his mouth. Bordeau -- trained in CPR -- noted a pulse of twelve per fifteen seconds. Nurse Gorman then arrived. Bordeau advised her of the pulse rate and then left. Nurse Gorman noted that John was no longer breathing. Because of the large amount of material in John's airways, Nurse Gorman could not clear them. She also unsuccessfully attempted mouth-to-mouth resuscitation. Nurse Gorman asked Mrs. Carter to get John -4- 4 Perreira, a teacher, athletic trainer, and dorm parent from a nearby dorm.  When Perreira arrived, Nurse Gorman was attempting to ventilate John. Perreira tried to find a pulse and -- when he was uncertain about having found one -- removed John to the floor to begin CPR. At 10:02 p.m., the rescue squad arrived and took over John's care. Rescue efforts continued briefly in the apartment. None of the rescuers could get air in John's chest or revive him. After the rescue squad removed John to the Newport hospital, Nurse Gorman called Dr. Koterbay. At the hospital, doctors administered intravenous epinephrine. An x-ray showed that John was suffering from tension pneumothorax, a condition where air has lodged between the lungs and the lining of the chest cavity. The emergency room physician vacated the air. John was pronounced dead at 10:50 p.m.  Subsequently, John's parents commenced this diversity-based wrongful death action. A thirteen-day trial ensued, during which both parties presented conflicting expert testimony. The plaintiffs presented two pediatric allergists who testified that John suffered from an allergy- induced anaphylactic shock reaction, which -- perhaps in combination with asthma -- led to his death. These experts testified that epinephrine reverses the shock and opens the airways, and that had it been administered in the apartment -5- 5 or when Nurse Gorman arrived, it would have reversed the shock and permitted John to survive.  The plaintiffs also presented another expert, the chief of pediatric pulmonology at Massachusetts General Hospital, who agreed that John suffered from anaphylaxis, specifically testifying that John had not suffered from pneumothorax. The court did not permit the plaintiffs to present expert testimony with regard to national nursing standards and standards regarding the development of individualized emergency care. The school's experts included a board-certified pulmonologist, who testified that John's symptoms indicate that he could have suffered a tension pneumothorax and that this was the cause of his death. This expert also testified that epinephrine would not have reversed the condition. A board-certified emergency room doctor also testified that Nurse Gorman, confronted with a case of cardiac arrest, met the standards for emergency care by attempting to clear the airways in order to perform CPR. A third expert, a board- certified pediatrician, testified that even if John was suffering from anaphylactic shock, by the time that Nurse Gorman arrived on the scene, the administration of epinephrine would not have changed the outcome inasmuch as John was at that point suffering from vascular collapse. Additionally, Dr. Koterbay testified that Nurse Gorman -6- 6 followed his orders and acted appropriately when confronted with a situation constituting cardiac arrest.  Following the jury verdict for the school, plaintiff filed a motion for new trial pursuant Fed. R. Civ. P. 59. The district court denied this motion by margin order. This appeal ensued. II. II. ___ DISCUSSION DISCUSSION __________ Although not altogether clear from their briefs, the plaintiffs appear to argue that the district court committed error by instructing the jury to apply an overly narrow -- and thus, erroneous -- interpretation of Rhode Island tort law. The plaintiffs also argue that the district court abused its discretion when it refused to grant a new trial. We discuss each issue separately.2   ____________________ 2. The plaintiffs also objected, and now assign error, to the district court's instruction that: Under Rhode Island law, epinephrine is a drug that may be administered only pursuant through the prescription or order of a licensed physician. Consequently, a nurse cannot be found negligent for failing to administer epinephrine in the absence of such a prescription or order unless she somehow was responsible for the absence of the prescription or order. The plaintiffs argue that the language of the Rhode Island statute governing nursing standards impliedly authorized Gorman to administer epinephrine. We do not agree. Rhode Island law is clear as to who may administer controlled substances and Gorman, as a registered nurse and -7- 7 A. Jury Instructions _____________________ We first set out the legal framework. An error in jury instructions warrants reversal of a judgment "`only if the error is determined to have been prejudicial, based on a review of the record [in its entirety].'" Kelliher v. ________ General Transp. Servs., Inc., 29 F.3d 750, 752 (1st Cir. ______________________________ 1994) (quoting Davet v. Maccarone, 973 F.2d 22, 26 (1st Cir. _____ _________ 1992)). Thus, the plaintiffs must demonstrate that the charge was erroneous and that the error was prejudicial. Connors v. McNulty, 697 F.2d 18, 21 (1st Cir. 1983). We _______ _______ examine jury instructions to determine whether they adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues. Kelliher, 29 F.3d at 752. ________ An additional consideration frames our discussion. Because plaintiffs invoke diversity jurisdiction, our analysis of applicable law is circumscribed. Plaintiffs who select "federal forum in preference to an available state forum may not expect the federal court to steer state law into unprecedented configurations." Martel v. Stafford, 992 ______ ________ F.2d 1244, 1247 (1st Cir. 1993); see also Ryan v. Royal Ins. ________ ____ __________ Co., 916 F.2d 731, 744 (1st Cir. 1990) (rejecting a diversity ___ plaintiff's attempt to stretch New York law to new frontiers  ____________________ lacking a physician's order, was not so authorized. R.I. Gen. L. 21-28-3.20 & 21-23-1.02(29). -8- 8 without providing a "well-plotted roadmap showing an avenue of relief that the state's highest court would likely follow").  The plaintiffs have failed to establish that the district court's instructions were erroneous. As to the school's liability, the district court instructed the jury, in relevant part, as follows: A school is required to do whatever a reasonably prudent school would do in safeguarding the health of its students, providing emergency assistance to them when required and arranging for appropriate medical care if necessary. That does not mean that a school is responsible for guaranteeing the health of its students. Obviously no one can guarantee anyone's health. Nor does it mean that a school is expected to have the knowledge of a physician or to assume the role of a physician in diagnosing or treating its students. What it means is that a school must act as a reasonable school in responding to medical needs of the students.  The plaintiffs objected to this instruction on the grounds that it understated the nature and scope of the defendant's liability with respect to the provision of health care for its students at the school. On appeal, while conceding that there are no Rhode Island cases precisely establishing the scope of the duty owed by a school, the plaintiffs advance two arguments supporting a duty broader than that reflected in the court's instructions. Notably, the effect of both the plaintiffs' proffered theories would -9- 9 be to hold the school liable for the acts or omissions of Dr. Koterbay.3  First, the plaintiffs argue that we should interpret Rhode Island law to hold the school to a nondelegable duty to provide reasonable health care, the scope of which includes having individualized standing orders in place in the event of an emergency. Had such an order been in place for John, presumably it would have authorized Nurse Gorman to administer epinephrine subcutaneously in the event of an allergic reaction. Importantly, the plaintiffs essentially concede that the school discharged duties created by Rhode Island's applicable laws and regulations. Thus, the thrust of their argument is that the school should be required to do more than the "bare minimum required of it under state law." Although the plaintiffs offer an extended policy-based discussion as to why a boarding school should be held to a higher duty, they do not cite any legal authority supporting their argument. Our own search has revealed nothing suggesting that such a broadly defined duty exists under Rhode Island law. On that basis, we detect no error in the court's description of the duty owed by the school.   ____________________ 3. The sole defendant in this suit is the school. Importantly, the district court found that Dr. Koterbay -- who was not named as a defendant -- was not the school's agent. Accordingly, the court instructed the jury that "the school is not legally responsible for the manner in which Dr. Koterbay performed his services as a physician."  -10- 10 Second, the plaintiffs argue that the jury instructions should have reflected the holding of Rodrigues _________ v. Miriam Hosp., 623 A.2d 456 (R.I. 1993), in which the Rhode ____________ Island Supreme Court held that a hospital could be held vicariously liable for a doctor acting under apparent authority. Beyond noting that the language of Rodrigues _________ itself appears to be limited to the hospital context, see id. ___ ___ at 462, we do not speculate as to what other situations the Rhode Island Supreme Court might apply that case's principles. Even assuming that, like the hospital in Rodrigues, a boarding school could be held vicariously liable _________ for the acts or omissions of a non-employee physician, the plaintiffs have failed to establish that Dr. Koterbay had the requisite apparent authority. Cf. id. (quoting Restatement ___ ___ (2d) Agency 267).4  We have reviewed carefully the plaintiffs' other arguments, and we detect no error in the district court's jury instructions.  ____________________ 4. We also disagree with the plaintiffs' argument that the school should be held directly liable under a corporate negligence theory. The plaintiffs did not present evidence on this theory, and we detect nothing in the record to suggest that the school "fail[ed] to exercise reasonable care in selecting [Dr. Koterbay] who the [school] knew or should have known was unfit or incompetent for the employment, thereby exposing third parties to an unreasonable risk of harm." Rodrigues, 623 A.2d at 463 (quotation omitted). _________ -11- 11 B. Motion for New Trial ________________________ A district court may set aside a jury's verdict and order a new trial only if the verdict is so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice. See, e.g., Lama v. Borras, 16 F.3d ___ ____ ____ ______ 473, 477 (1st Cir. 1994). A trial judge's refusal to disturb a jury verdict is reversed only for abuse of discretion. Id. ___ We conclude that the district court did not abuse its discretion. Although the facts in this case are tragic, the legal principles are relatively straightforward and, as our discussion above suggests, the district court properly presented them to the jury. We have reviewed the record carefully, and it would serve no purpose to recapitulate it in detail here. Directly stated, we conclude that a reasonable factfinder could have determined that the defendant was not liable, and that such a determination would not constitute a miscarriage of justice. The record supports a conclusion that the defendant did not breach any duty that it owed to John. Accordingly, the district court was well within its discretion in denying the plaintiffs' motion. III. III. ____ CONCLUSION CONCLUSION __________ For the foregoing reasons, the decision of the district court is affirmed. affirmed. ________ -12- 12