Peter J. ROCK et al.

v.

STATE of Rhode Island et al.

No. 94–618–Appeal.

Supreme Court of Rhode Island.

Aug. 9, 1996.

Stephen Rappoport, Maria Medeiros Wall, Providence, for Plaintiff.

Arlene M. Violet, East Providence, James R. Lee, Michael G. Sarli, William L. Wheatley, Providence, for Defendant.

## OPINION

MURRAY, Justice.

The case before us is a wrongful-death action filed by the plaintiffs, Peter J. Rock and Linda K. Rock (plaintiffs), against a number of defendants including the State of Rhode Island and Motoring Technical Services, Inc. (Motoring). This action arises out of the sexual assault and murder of the plaintiffs' minor daughter, Kimberly Ann Rock, by Robert Jewett (Jewett). During the course of the proceedings below, Motoring filed a motion for summary judgment, which was

granted by the Superior Court on August 30, 1994. This case comes before us now on the appeal by the plaintiffs from the summary judgment entered in favor of Motoring. This appeal therefore involves the defendant Motoring only. After reviewing the record before us, we affirm the Superior Court's entry of summary judgment in favor of Motoring.

The facts giving rise to the instant appeal are as follows. Jewett was an inmate at the Rhode Island Training School (training school), serving a sentence on a charge of first-degree sexual assault of a twelve-year-old girl; Jewett was a minor at the time he was charged with that crime. While incarcerated, Jewett participated in a temporary community-placement program with Motoring. Motoring is a private vocational-training school open to the general public.

In his application to the program at Motoring, Jewett indicated that he was incarcerated for breaking and entering only. Neither Jewett nor Robert McCutcheon (McCutcheon), in his capacity as an agent for the state, provided any information to Motoring regarding Jewett's prior adjudication for sexual assault. McCutcheon did inform Motoring, however, that Jewett was to be treated "like any other student." Jewett was not to be given any special supervision. He also informed Motoring that Jewett would be escorted to and from Motoring's premises in a state transport van and that Jewett was to eat his lunch on the premises. In addition, Motoring was to contact the training school whenever Jewett was absent or whenever a disciplinary problem arose. On or about January 22, 1990, Jewett began classes at Motoring.

On February 8, 1990, during a morning recess, Jewett left Motoring's premises. He entered plaintiffs' home, which was located approximately one block from Motoring, and sexually assaulted and murdered plaintiffs' minor daughter. On October 30, 1991, Jewett pleaded guilty to first-degree murder and was sentenced to life imprisonment.

The plaintiffs have now filed the instant wrongful-death action against numerous defendants including Motoring. In regard to their claim against Motoring, the complaint alleged that "Motoring owed a duty of care to Kimberly Ann Rock which included, inter alia, a duty to adequately monitor and supervise Training School inmate Robert E. Jewett while he was a participant in the [temporary-community placement] Program at Defendant M[otoring] S[chool]." Motoring subsequently filed a motion for summary judgment, arguing that it owed no duty to plaintiffs under the facts of the instant case. The Superior Court justice agreed and found that Motoring did not owe a duty to plaintiffs. On August 30, 1994, summary judgment was entered in favor of Motoring. The plaintiffs have now filed the instant appeal with this court. As we address the issues raised in this appeal, any additional facts as may be necessary will be provided.

We pause now to make an observation with respect to one of the facts as related by the dissent. We find nothing in the record before us in reference to the deposition of Thomas Ring that would have alerted Motoring, in this first-time venture with the state, that this inmate had violent tendencies. The cases quoted in the dissent involve entities which were in the business of admitting inmates. The case before us involves an entity, which as the record indicates, did not make it a business to take in inmates. This was Motoring's first and last contact with the penal system of the State of Rhode Island.

When reviewing the granting or the denial of a motion for summary judgment, this court applies the same analysis that the motion justice applied. *See E.W. Audet & Sons, Inc. v. Fireman's Fund Insurance Co.*, 635 A.2d 1181 (R.I.1994). Rule 56(c) of the Superior Court Rules of Civil Procedure provides that after a hearing on a motion for summary judgment, "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as [a] matter of law." Our review includes examining the pleadings and the affidavits in a light most favorable to the party opposing

the motion. *E.W. Audet & Sons, Inc.,* 635 A.2d at 1185. We shall uphold the Superior Court's order granting summary judgment "[o]nly when our review reveals no issues of material fact, and the moving party is entitled to judgment as a matter of law." *Barratt v. Burlingham,* 492 A.2d 1219, 1220 (R.I. 1985).

Here plaintiffs argue that the trial justice erred in granting summary judgment in favor of Motoring. They contend that material issues of fact exist regarding Motoring's negligence in supervising Jewett and in placing him in an adult program which allowed him to roam freely off the school premises. We note that in order for plaintiffs to recover in a negligence action, they must prove, inter alia, a duty or an obligation owed by Motoring. *Ferreira v. Strack,* 636 A.2d 682, 685 (R.I.1994) ("[a] defendant cannot be liable under a negligence theory unless the defendant owes a duty to the plaintiff"). Accordingly, the threshold issue to be determined on appeal is whether Motoring owed a duty to plaintiffs in the instant case.

■ We have stated that as a general rule the existence of a duty is a question for the court and not for the jury. *See id; Banks v. Bowen's Landing Corp.,* 522 A.2d 1222, 1224 (R.I.1987). This court has previously recognized the difficulty of constructing a workable test to determine whether a duty exists in a particular case. *See Ferreira,* 636 A.2d at 685. We have stated that foreseeability of harm to a plaintiff is a factor to be considered when evaluating whether a duty exists. *Builders Specialty Co. v. Goulet,* 639 A.2d 59, 60 (R.I.1994); *see Banks,* 522 A.2d at 1225. However, "foreseeability of injury does not, in and of itself, give rise to a duty." *Marchetti v. Parsons,* 638 A.2d 1047, 1051 (R.I.1994). We are mindful that any consideration regarding the existence of a duty in a particular case "should reflect considerations of public policy, as well as notions of fairness." *Ferreira,* 636 A.2d at 685.

■ In light of the above principles we now turn to the specific issue before us, which is whether Motoring owed a duty to plaintiffs. For the reasons stated below, we are not persuaded by plaintiffs' contentions that Motoring was under a duty to supervise Jewett or that Motoring was under a duty to investigate further into Jewett's juvenile record in order to prevent the type of harm sustained by plaintiffs as a result of Jewett's criminal actions. There is nothing in the record to indicate that Motoring could have reasonably foreseen that Jewett would leave Motoring's premises and sexually assault and murder plaintiffs' minor daughter.

We note, as the Superior Court indicated, that Motoring is not a custodial or a penal facility. It is a vocational school open to the public and therefore is under no obligation to maintain continuous supervision of its students. *See Beauchene v. Synanon Foundation, Inc.,* 88 Cal.App.3d 342, 151 Cal.Rptr. 796 (1979) (a private drug rehabilitation center to which courts referred some offenders owed no duty to the general public with respect to the precautions it took against escape of those persons who were referred to it and were accepted so that a member of the public who was shot by one who escaped from the center could not recover from the center on a negligence theory). *See also Smith v. Day,* 148 Vt. 595, 538 A.2d 157 (1987) (although the university exercised a large degree of control over student activities and imposed stringent rules and regulations governing student life at the university, it did not have a legal duty to control the volitional criminal acts of its students).

Although Motoring knew that Jewett was transported to and from its premises in a state-owned van and that Motoring was to inform the state if Jewett left its premises, the record before us indicates that the state never requested Motoring to provide custodial services in regard to Jewett's attendance at Motoring. In fact, the state, through its representative, dispelled any reason for Motoring's providing continuous supervision of Jewett while he attended classes at Motoring. The state portrayed Jewett as a highly motivated individual and indicated that he was among "the best kids [who were] allowed to utilize this opportunity in terms of working off grounds." The state also informed Motoring that Jewett had been allowed to spend weekends away from the training

school and that only one adult was required to supervise him during the weekends. It appears that the state persuaded Motoring to treat Jewett as it would any other student attending its program. In these circumstances we are not persuaded that Motoring could have reasonably foreseen that Jewett would leave its premises and subsequently commit a criminal act. We are therefore of the opinion that the trial justice correctly found that Motoring owed no duty to supervise Jewett or to prevent him from leaving its premises.

Moreover, contrary to plaintiffs' assertions, the mere fact that Jewett was an inmate at the training school was *not* sufficient to place Motoring on notice that it was dealing with a potentially dangerous individual or that Motoring was under a duty to investigate further into Jewett's juvenile record. We note that Motoring was never fully informed of Jewett's criminal background. The record indicates that when Motoring questioned Jewett and the state regarding the reasons for Jewett's confinement, Jewett informed Motoring that he was incarcerated for a breaking and entering charge only. Neither he nor the state apprised Motoring of the rape and attempted-strangulation charge. As the Superior Court noted, Motoring could not have obtained, nor was it able to obtain, such information. Because Jewett was a juvenile at the time he was adjudicated of the charge of rape and attempted strangulation, Motoring was precluded from obtaining this information pursuant to G.L.1956 § 42–72–8.[1] We therefore cannot conclude that Motoring could have reasonably foreseen that Jewett would enter plaintiffs' home and sexually assault and murder plaintiffs' minor daughter.

We are mindful that the facts of this case as construed by the dissent could seduce one into a belief in an interpretation of the law that would impose a duty upon the Motoring. Unfortunately, the facts of the record do not support such a construction. There is not a shred of evidence that Motoring had the slightest notice that Jewett was dangerous or had been so regarded by the authorities at the training school. Indeed, the evidence and the record indicate precisely the contrary. He was represented to Motoring as a good student who was about to be released from custody. The fact of the mode of transportation by van from the training school to Motoring's premises was utterly without significance. Any training school resident would be so transported. The dissent attempts to characterize Motoring as a jailer. It was not. It was a vocational school and nothing else. The citation of *Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's, Inc.* 474 A.2d 436 (R.I.1984), is without relevance. In that case Pinkerton was in the security business and hired a young man to guard a gold supply without having checked him out adequately to ascertain that he had a criminal record. Pinkerton's obligation bore no relationship whatever to that of Motoring, which was neither a jailer nor a security agency. It is significant to note that Jewett was the first and only resident of the training school who had ever been referred to Motoring as a student.

Given the totality of the circumstances in the instant case, we cannot conclude that Jewett's actions were within the scope of foreseeability. There is nothing in the record to indicate that Jewett would leave Motoring's premises, arrive at plaintiffs' home, and sexually assault and murder plaintiffs' minor daughter. We therefore agree with the Superior Court's determination that defendant did not owe a duty to plaintiffs in the instant case.[2]

---

1. General Laws 1956 § 42–72–8(a) provides that "[a]ny records of the department pertaining to children and their families in need of service pursuant to the provisions of this chapter or for whom an application for services has been made shall be confidential and only disclosed as provided by law." Although disclosure of confidential information is permitted under certain circumstances as provided for in the statute, there is nothing in the record before us to indicate that Jewett's juvenile records may be disclosed under those particular exceptions.

2. Because plaintiffs in the instant case have failed to show that Motoring knew or should have known that Jewett would cause bodily harm to others if not controlled, their reliance on the Restatement (Second) *Torts* § 319 is misplaced. The Restatement (Second) *Torts* § 319 provides that "[o]ne who takes charge of a third person *whom he knows or should know to be likely to cause bodily harm to others if not controlled* is under a duty to exercise reasonable care to control the third person to prevent him from doing

If the leap of logic suggested by the dissent were to become the law of the State of Rhode Island, such options as work-release programs for adult offenders and off-premises education and rehabilitative programs for residents of the training school would come to an abrupt end. The parties responsible for determining whether a resident can be given educational or vocational training off the training school premises are solely that of the parties who are in charge of the training school. We do not enhance this duty by punishing the innocent. If Jewett had been sent into a university or a secondary school setting for off-premises education, he would not then have become subject to a custodial arrangement. The duty of custody remains that of the state, not of an educational institution which is persuaded to accept a resident for the limited purpose of education and training.

In reaching our decision today, we are mindful that any consideration in the instant case must reflect not only public policy but also notions of fairness. As indicated earlier, Motoring was under no obligation to treat Jewett differently from other students attending its program, was never informed of Jewett's juvenile record regarding the earlier charge of rape and attempted strangulation, and was precluded by law from obtaining such information. In these specific circumstances we believe that it would be contrary to fundamental notions of fairness to impose a duty upon Motoring in situations in which Jewett's actions were volitional criminal acts for which Motoring had absolutely no reasonably foreseeable notice.

Since we find that no duty was owed by Motoring to the plaintiffs in the instant matter, we need not reach the plaintiffs' remaining issues raised on appeal. We are of the opinion that the trial justice did not err in granting summary judgment in favor of the defendant Motoring. We therefore affirm

the summary judgment entered in Superior Court. The plaintiffs' appeal is denied and dismissed, and the papers of this case are remanded to the Superior Court for further proceedings against the remaining defendants.

FLANDERS, Justice, with whom LEDERBERG, Justice, joins, dissenting.

This case calls upon us to decide whether a private business corporation that, for a profit, owns and operates a vocational-training facility located in a residential neighborhood and whose clientele included at least one inmate who was serving a sentence for having committed violent juvenile offenses owed any duty to its neighbors to exercise reasonable care (1) in ascertaining the inmate's juvenile-offense record and in investigating his background to determine whether to allow him to enter onto and to remain on its property to obtain vocational training; (2) in determining the appropriate level of supervision, monitoring, and control that should have been implemented as a condition of voluntarily allowing him to enter onto and to remain on its property to obtain such training (once it decided to permit entry in the first place); and (3) in monitoring and supervising the inmate during that portion of the day when he was supposed to be in training on its premises. Because I believe a duty of care existed in the circumstances of this case, I respectfully dissent from the majority's opinion that reaches a contrary conclusion.

### Facts[3]

The plaintiffs, Peter and Linda Rock, were the parents of a now-deceased seventeen-year-old girl named Kimberly Ann Rock, who was brutally raped and murdered in her parents' East Providence home on February 8, 1990, by one Robert Jewett. At the time of

such harm." (Emphasis added.) The plaintiffs' reliance on case law which comports with the principles § 319 is equally unpersuasive. *See Dudley v. Offender Aid and Restoration of Richmond, Inc.,* 241 Va. 270, 401 S.E.2d 878 (1991).

**3.** Because this matter is here on plaintiffs' appeal from a judgment entered against them after a

Superior Court justice granted defendant's summary-judgment motion, the facts are set forth in a light most favorable to plaintiffs after all reasonable inferences have been drawn in their favor. *See, e.g., E.W. Audet & Sons, Inc. v. Firemen's Fund Insurance Co.,* 635 A.2d 1181, 1185 (R.I.1994).

his rape and murder of plaintiffs' daughter, Jewett was an eighteen-year-old inmate of the Rhode Island Training School, still serving out his sentence for having raped and attempted to murder another young girl just two years earlier.

The defendant, Motoring Technical Services, Inc. (Motoring), is a privately owned corporation in the business of providing vocational instruction and technical-job skills to persons who apply for and are accepted into one of its training programs. For a fee paid to Motoring with public funds, Motoring allows trainees to come onto its property and to attend classes at the commercial training facility that it owns and operates in a residential area of East Providence, Rhode Island. On premises that are located one block from plaintiffs' home, Motoring teaches trainees various technical trades such as automotive and small-engine mechanics.

Through arrangements made with the State of Rhode Island, Robert Jewett was one such trainee whom Motoring, for a fee, agreed to instruct at its East Providence facility. However, as Motoring well knew from the application that Jewett submitted, this trainee was different from its other charges. Indeed, when Motoring voluntarily undertook to allow him to enter upon its premises and to begin training him there in automotive mechanics, Jewett was still a Rhode Island Training School inmate who was incarcerated by the state and serving out his sentence at the training school. Moreover, Jewett was not just any juvenile delin-

quent; rather, he was a rapist and an attempted murderer of a twelve-year-old girl.[4]

Although neither the state nor Jewett's application to Motoring disclosed his prior rape and attempted-murder offenses, his application to Motoring did admit that Jewett had been convicted of an unspecified number of breaking and entering offenses (B & Es). If not an outright falsehood, this statement was at least an incomplete rendition of Jewett's actual juvenile record of offenses because, at a minimum, it omitted his delinquency adjudication for rape and attempted murder. Nonetheless, Jewett's application served to put Motoring on notice that it was dealing with someone who, by his own admission, had a history of committing violent acts and who was still incarcerated for such offenses at the very time when he would be on Motoring's property undergoing training.[5] Notwithstanding these giant red flags raised by Jewett's application, Motoring requested no particulars from the state or from Jewett concerning the nature, number, and temporal proximity of Jewett's admitted B & Es, or concerning the truth and completeness of Jewett's history of past offenses as stated on his application to Motoring.[6] Nor did it take any steps to obtain for itself an accurate picture of just what kind of an inmate it was about to bring onto its property for extended periods and thereby expose to danger innocent members of the public like plaintiffs and their daughter.

**4.** Jewett had been adjudicated a "delinquent" because he was under eighteen years of age when it was determined that he had committed the rape and attempted-murder offenses for which he was incarcerated and because he had committed offenses that, if committed by an adult, would have constituted felonies. *See* G.L. 1956 § 14–1–3(5).

**5.** "Breaking and entering," along with murder, manslaughter, rape, mayhem, and a host of other serious offenses, is "classified as a *crime of violence* in Rhode Island * * *." (Emphasis added.) *State v. Germano*, 559 A.2d 1031, 1035 (R.I.1989) (citing G.L.1956 § 11–47–2). Indeed, breaking and entering covers a whole continuum of violent crimes ranging from breaking and entering into a dwelling without the consent of the owner or tenant, *see* G.L.1956 § 11–8–2, to breaking and entering with the intent to commit

murder or sexual assault. *See* §§ 11–8–3, 11–8–4.

**6.** According to Robert M. McCutcheon, the state official responsible for placing Jewett with Motoring, he was authorized to "tell [Motoring] whatever information was necessary in order to secure the placement or job." However, McCutcheon also claimed that if he had been asked, he would have told Motoring that he could not discuss Jewett's history of past offenses but that Motoring could ask Jewett about it. Since Motoring failed to ask the state any questions about Jewett's record or background, we do not know what information pertinent to Jewett's true and complete record of juvenile offenses would have been disclosed to it by the state, especially if Motoring had communicated that its receipt of such information "was necessary * * * to secure the placement" of Jewett with Motoring.

Moreover, the state told Motoring that it would have a guard drive Jewett in a state van to Motoring's East Providence property every weekday morning when classes were held, wait there until Jewett entered upon Motoring's property, and then return to pick up Jewett in the afternoon at the end of each class day, during which Motoring was supposed to be teaching Jewett to become an automobile mechanic. Most importantly, before Motoring agreed to accept Jewett for training at its facility, the state told Motoring that Jewett should not be allowed to leave Motoring's premises at any time during his presence there, not even to eat his lunch, and that if Jewett left, was ever absent, or caused any disciplinary problems, Motoring was to call the state. By now, those big red flags raised by the B & Es admission in Jewett's application and by the state's concerns about making sure that Jewett remained on Motoring's property should have been snapping and banging against Motoring's metal flagpole. Still, Motoring did nothing on its own and said nothing to the state or to Jewett to ascertain Jewett's actual record of committing violent offenses.

Instead of checking into Jewett's record to determine exactly what type of person it was about to introduce to its unsuspecting employees, trainees, and neighbors, on January 22, 1990, Motoring voluntarily began to allow Jewett to enter onto its property. It did so by receiving him from the custody of his state guard, who drove him there in a van every morning, and it began returning him to the custody of the state at the end of each class day when the guard-driven state van returned to Motoring to pick up Jewett for the trip back to the Rhode Island Training School.

Unfortunately for the Rock family, almost immediately after Motoring began taking in Jewett as a trainee, it failed to heed the state's instructions about the need for Motoring to monitor Jewett and to supervise his whereabouts during his presence on Motoring's property so that it could advise the state if Jewett ever left or was absent from its premises or was causing any disciplinary problem. Indeed, Motoring failed to implement any effective absence-detection or be-havior-monitoring measures at all in allowing Jewett to come onto and supposedly remain on its property during the training periods, treating him as if he were no different from any other public adult enrollee in one of its training programs. Thus, although Jewett was still an eighteen-year-old juvenile, Motoring placed him in one of its unsupervised adult programs, thereby communicating to him that he would be allowed to come and go as he pleased during and between Motoring's vocational instruction classes, just like all the adult trainees in these programs.

Moreover, Motoring even failed to advise the instructor it employed to train Jewett that, by Jewett's own admission on his application to Motoring, Jewett had been repeatedly convicted of B & Es (let alone that he was, albeit a fact undisclosed to Motoring, a person who had committed rape and attempted murder); that Jewett was still incarcerated for his offenses while he was attending Motoring's facility; and that at the state's request the state was to be contacted immediately if and when Jewett ever left or was absent from Motoring's premises during the class day or if he caused any other type of disciplinary problem. Instead Motoring said nothing to its own employees about Jewett's incarceration status, placed him in an adult program, and allowed him to be absent from its premises at will during the class day—all without notifying the state.

To plaintiffs' everlasting regret, Jewett lost no time in fully exploiting these lax conditions at Motoring's facility. For the first two weeks of his new East Providence placement, Motoring allowed Jewett to rove at will through the residential neighborhood that borders its facility while he was supposed to be attending auto-mechanics classes and remaining on Motoring's premises during any breaks in the class day. Thus, various witnesses reported seeing Jewett repeatedly at large during class time in the East Providence neighborhood immediately next to Motoring's facility. Neighbors testified to Jewett's staring balefully at them as he furtively skulked from house to house, to observing him bound over backyard fences, and to watching him peer suspiciously at family members while crouching down across

the street from them as he prowled through the neighborhood.

Finally, on February 8, 1990, a little over two weeks after Motoring had first received Jewett from the state's custody and taken him in as a trainee on its own property and at the very moment when Motoring was supposed to be busy instructing Jewett in the fine points of automotive mechanics, Jewett was himself busy one block away raping and killing plaintiffs' seventeen-year-old daughter. True to its previous and repeated failure to keep any tabs whatsoever on Jewett, Motoring had not only neglected to notify the state of Jewett's truancy on this fateful day but failed even to note Jewett's absence from its premises, never having undertaken any act that could effectively determine whether he was even present at its facility on any given day or at any given time. Thus, as it had done on innumerable earlier occasions in the two weeks before Jewett finally raped and murdered plaintiffs' daughter, Motoring apparently allowed Jewett to come and go as he pleased during the class day, letting him absent himself at will from its premises and from the instruction it had agreed to provide to him (though it was quite careful not to neglect pocketing the fee that was paid to it with public funds for its phantom pass at training Jewett).

Motoring thereby gave Jewett every opportunity to case the neighborhood, to stake out the homes and families that could be his potential targets, and to stalk the every movement and time-of-day locations of his selected victim (plaintiffs' daughter, Kimberly Ann Rock), all of which in turn allowed Jewett to minimize if not eliminate many of the difficulties, uncertainties, and risks he normally would have faced if he had not had the generous time and planning opportunities for committing his eventual crimes that Motoring's liberal attendance and leave-taking practices so graciously afforded him.

Accordingly, when Jewett decided to strike and commit his next violent crime in Motoring's East Providence neighborhood, Motoring's failure to monitor Jewett's attendance, to take notice of Jewett's repeated absences from its facility, and to notify the state of his felonious wanderlust (as it had been requested to do) all allowed Jewett the more than two weeks of planning that led up to the commission of his dastardly deeds and emboldened him to see his nasty business through to its odious end with little fear that Motoring would blow the whistle on him.

Needless to say, plaintiffs, Peter and Linda Rock, undoubtedly horrified over the negligence and carelessness that had allowed Jewett to rape and then to snuff out their seventeen-year-old daughter's life, filed suit against Motoring and the state as well as the various individuals associated therewith who are allegedly responsible for their daughter's untimely and unnecessary death. A trial justice dismissed their claim against Motoring after he concluded that, as a matter of law, Motoring owed no duty of care to these plaintiffs. A majority of the court now affirms this ruling.

### Analysis

Before a negligence claim will lie against a particular person or entity, a court must first decide whether "there exists a duty of care running from the defendant to the plaintiff * * *." *D'Ambra v. United States*, 114 R.I. 643, 649, 338 A.2d 524, 527 (1975) ("in the first instance, [this is] a question for the court and not for the jury").[7] Although there is no "easily expressible" formula for determining whether a duty of care is present in a particular case, all relevant factors must be weighed, and "[w]here there is a widespread need for redress, the judicial system should consider very carefully before it undertakes to reject, as a matter of law, an entire class of claims." *Id.* at 648, 650, 652, 338 A.2d at 526, 527, 529; *accord Ferreira v. Strack*, 636 A.2d 682, 685 (R.I.1994) (agreeing with *D'Ambra's* "ad hoc approach of considering all relevant factors" in deciding whether a duty exits).

In *Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's, Inc.*, 474 A.2d 436, 440 (R.I.1984), we found a duty of care was

---

7. "[A] legal duty so called is nothing but a prediction that if a man does or omits certain things he will be made to suffer in this or that way by judgment of the court." Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L.Rev. 457, 458 (1897).

owed by a security-guard company "premised on its failure to exercise reasonable care in selecting a person who the employer knew or should have known was unfit or incompetent for the employment, *thereby exposing third parties to an unreasonable risk of harm.*" (Emphasis added.) In doing so, we relied on a section of the Restatement (Second) of *Torts,* which provides that an actor must take precautions "[w]here the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct." *Id.* at 441 (quoting Restatement (Second) *Torts* § 302B, cmt. e, pt. D at 91 (1965)); *see also* Restatement (Second) *Torts* § 319 ("[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm"); *accord Nova University, Inc. v. Wagner,* 491 So.2d 1116, 1118 (Fla.1986) (per curiam) ("[A] facility in the business of taking charge of persons likely to harm others has an ordinary duty to exercise reasonable care in its operation to avoid foreseeable attacks by its charges upon third persons. If reasonable care is exercised, there can be no liability. The alternative, the exercise of no care or unreasonable lack of care, subjects the facility to liability."); *Dudley v. Offender Aid and Restoration of Richmond, Inc.,* 241 Va. 270, 279–80, 401 S.E.2d 878, 883 (1991) (applying § 319 to a privately operated "halfway house" for convicted felons that allowed an inmate to leave, rape, and kill a neighbor of the facility).[8]

Here, Motoring "took charge" of Jewett when it voluntarily agreed, for a fee, to train him on its facility, when it voluntarily received him from the guard who drove the van that transported him from state custody and ushered him onto its premises, and when it allowed him to remain on its property without any state escort—always sensible that it was doing so during Jewett's tenure as an inmate serving out his sentence in Rhode Island's juvenile-detention system for having committed multiple violent offenses.

Contrary to the majority's assertions, it is not the mere fact that Jewett was an inmate at the Rhode Island Training School that put Motoring on notice that it was dealing with a potentially dangerous individual or that obliged Motoring to investigate further into his record of committing violent offenses. Rather, it was the fact that Motoring knew that by his own admission Jewett had been repeatedly convicted of violent crimes (B & Es) and that the state was so concerned about the violent propensities of this juvenile rapist and attempted murderer that (1) it took him to and from Motoring's premises in a guarded van and (2) it instructed Motoring that (a) it was to notify the state if and when Jewett was ever absent from Motoring's facility and that (b) Jewett was not to be allowed to leave Motoring's premises even to eat his lunch. Only by ignoring these facts or by claiming that they are "utterly without significance" can the majority state that "[t]here is not a shred of evidence that Motoring had the slightest notice that Jewett was dangerous or had been so regarded by the authorities at the training school."

In addition Motoring knew or should have known that by allowing a person with Jewett's violent background and incarcerated status to enter upon its property with no monitoring or supervision, it was placing him in a position in which he could foreseeably harm other individuals, including its other trainees, its employees, and its neighbors, if his propensity for committing violent offenses were to continue. *See* Restatement (Second) *Torts* § 281 (discussing risks to a foreseeable "class of persons"); *id.* § 302B

---

8. For an additional case addressing the duty question in a parolee context, see *Taggart v. State,* 118 Wash.2d 195, 220, 822 P.2d 243, 255 (1992) ("[w]hen a parolee's criminal history and progress during parole show that the parolee is likely to cause bodily harm to others if not controlled, the parole officer is under a duty to exercise reasonable care to control the parolee and to prevent him or her from doing such harm"); *id.* at 223, 822 P.2d at 257 (adding "a parole officer may 'take charge' of a parolee, thereby assuming the duty to protect reasonably foreseeable dangers, despite the absence of a custodial relationship and without exercising * * * 'continuing hourly or daily dominance and dominion' over that parolee").

cmt. e, pt. D (requiring precautions when the "actor has brought into contact or association with the other" a person known to be "peculiarly likely to commit intentional misconduct," in circumstances that "afford a peculiar opportunity or temptation for such misconduct").[9]

"Foreseeability," we have said, "relates to the natural and probable consequences of an act." *Hueston v. Narragansett Tennis Club, Inc.,* 502 A.2d 827, 830 (R.I.1986). And the fact that an actor,

> "at the time of his negligent conduct, neither realized nor should have realized that it might cause harm to another of the particular kind or in the particular manner in which the harm has in fact occurred, is not of itself sufficient to prevent him from being liable for the other's harm if his conduct was negligent toward the other and was a substantial factor in bringing about the harm." Restatement (Second) *Torts* § 435, cmt. a; *accord Taggart,* 118 Wash.2d at 225, 822 P.2d at 258.

The *Taggart* decision provides a useful illustration. There, a person previously convicted of assault raped a woman while out on parole. 118 Wash.2d at 201, 822 P.2d at 245–46. On the foreseeability issue, the Washington Supreme Court held that the

"fact that the violence took the form of raping [the plaintiff], when [the parolee's] criminal history did not include rape, does not show that injury to [the victim] was not foreseeable. *Violence* against [the plaintiff] may have been foreseeable, even though the form of that violence may not have been." (Emphasis added.) *Id.* at 225, 822 P.2d at 258.

Thus, the majority's conclusion that Motoring could not have reasonably foreseen that Jewett would enter plaintiffs' home and "sexually assault and murder plaintiffs' minor daughter" is a red herring; no such particular harm need be foreseen for a duty of care to exist.[10] Here, Jewett's admission to repeated B & Es should have been enough to alert Motoring that if it took such a person into its facility and allowed him to remain there unsupervised and unmonitored for extended periods, it should at least assume that he would be likely to break into and enter homes in the area. Thus, the likelihood of some type of violence against Motoring's neighbors was clearly foreseeable if Motoring allowed Jewett to have extended and unchecked access to them.

Moreover, I disagree with the majority's conclusion that by exercising reasonable diligence, Motoring could not have obtained all the information it needed to review concern-

9. Indeed, the danger such inmates would present to the public if they were allowed to come and go as they pleased during the period they are serving out their sentences is part of the reason why such individuals are incarcerated and restrained by the state for their crimes or offenses in the first place, *see State v. Ouimette,* 117 R.I. 361, 367–68, 367 A.2d 704, 708 (1976) (noting, among other reasons, that persons are incarcerated to "protect society" from their "antisocial behavior"), and why (among its other precautions) the state uses guard-driven vans when such inmates need to be transported from one place to another. Far from being "utterly without significance," the importance of this fact and the other indicia of the state's efforts to "protect society" from Jewett while he was still incarcerated for his offenses should have been apparent to Motoring.

10. There are, of course, many situations in which an actor "is *required* to anticipate and guard against the intentional, or even criminal, misconduct of others." (Emphasis added.) Restatement (Second) *Torts* § 302B, cmt. e. Generally, these situations may arise when, for example,

"the actor's own affirmative act has created or *exposed* the other to a recognizable high degree of risk of harm through such misconduct * * *." (Emphasis added.) *Id.* Thus, actors like Motoring must take reasonable care when they have

> "brought into contact or association with the other a person whom the actor[s] know[ ] or should know to be *peculiarly likely* to commit intentional misconduct, under circumstances which afford a *peculiar opportunity* or *temptation* for such misconduct * * * "

or when they have

> "taken charge or assumed control of a person whom [the actors] know[ ] to be *peculiarly likely* to inflict intentional harm upon others."

(Emphases added.) *Id.,* cmt. e, pts. D & F. According to the Restatement, a clear cut example is a situation where

"A, who operates a private sanitarium for the insane, receives for treatment and custody B, a homicidal maniac. Through the carelessness of one of the guards employed by A, B escapes, and attacks and seriously injures C. A may be found to be negligent toward C." *Id.,* cmt. e, pt. F, illus. 12.

ing Jewett's complete history of juvenile offenses, including his previous delinquency adjudication for rape and attempted murder. Under G.L.1956 § 42–72–8(b), such records can be disclosed "when necessary" to those "individuals, or public or private agencies engaged in * * * education of the person under the supervision" of the Department of Children, Youth and Families, as well as to "individuals or public or private agencies for the purposes of temporary or permanent placement of the person, and when the director determines that the disclosure is needed to accomplish that placement." Here, the state wanted Jewett to be educated in automobile mechanics at Motoring's training school, and Jewett wanted to obtain such training. The state was prepared to provide Motoring with "whatever information was necessary" to secure the placement. Thus Motoring could have and should have insisted, as a condition of any agreement on its part to allow Jewett to enter upon its property and receive training, that Motoring first obtain full disclosure from the state under this law (or otherwise) of any pertinent records concerning the past behavior of this proposed trainee, including his complete record of juvenile offenses, before it would accept him at the school or allow him to step one foot onto its property.[11] This statute expressly provides the means and the justification by which such disclosure could have been obtained had Motoring exercised even a modicum of ordinary care and diligence. Thus, in my opinion, the majority misconstrues § 42–72–8 when it concludes that Jewett's true record of previous offenses could not have been disclosed to Motoring under this statutory provision.

To be sure, the state and its agents would appear to be guilty of the most deplorable kind of malfeasance in misrepresenting and failing to disclose the precise nature of Jewett's juvenile record to Motoring. But I do not think we should permit a private business corporation—especially one like Motoring that is making a profit from public funds for every one of these potentially violent inmates

that it agrees to train—to hide its head in the sand and thereby duck its own responsibilities concerning the need to ascertain the true and complete juvenile and criminal records of these individuals, especially when it comes to investigating and taking precautions against the known violent tendencies of such persons. *See Glanzer v. Shepard,* 233 N.Y. 236, 239, 135 N.E. 275, 276 (1922) ("[i]t is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all") (Cardozo, J.). And it should do so *before* it voluntarily agrees to invite these inmates to come onto its property and thereby knowingly places them in a position to harm others in the foreseeable zone of danger, including its other trainees, its employees, and its neighbors like the Rock family. *See* Restatement (Second) *Torts* § 281, cmt. c (for an actor "to be negligent with respect to the other, his conduct must create a recognizable risk of harm to the other individually, or to a class of persons—as, for example, all persons within a given area of danger—of which the other is a member"); *see also Dudley,* 241 Va. at 279, 401 S.E.2d at 883 (one who "takes charge" of a dangerous person under § 319 of the Restatement owes a duty to the "entire class of prospective victims").

But even if Motoring had no ability to compel or to dicker for the disclosure of these records as a condition precedent for admitting Jewett to its property and its training programs, I would still find that Motoring had more than enough knowledge and information to know what type of risk it was facing when it voluntarily agreed to accept this inmate as a trainee and allowed him, for a fee, to enter onto its property. Regardless of whether Jewett was Motoring's first and last inmate trainee or its millionth, Motoring was the possessor of the land and chattels that Jewett would be using during his training period, and thus it could have and should have imposed reasonable conditions on Jewett's use of its property.

---

11. Indeed, I know of no reason why Motoring, as a condition of admitting Jewett to its training program, could not have obtained both his consent and that of the state to its taking reasonable measures to monitor Jewett's presence and to prevent his unauthorized absence from its premises during the training periods.

Since it had no *a priori* obligation to allow Jewett access to its facilities, it certainly had not only the ability but the duty to do so.[12] For example, as a condition of allowing Jewett to participate in its training programs, Motoring could have (1) required Jewett to check in periodically when he was supposed to be present on its property, (2) assigned a guard or an employee to watch or to monitor him, (3) installed surveillance cameras, and/or (4) required Jewett to wear a band that would emit electronic signals so that his on-premises location could be monitored and verified.

Moreover, notwithstanding the state's request to notify it whenever Jewett left Motoring's premises or caused a disciplinary problem, Motoring negligently failed to heed the very conditions under which it was to train Jewett and instead let him have the run of the neighborhood for the two weeks leading up to his murderous rampage, thereby affording him the luxury of stalking and staking out his eventual victim, a young girl like the one he had previously raped and almost killed. In these circumstances, it is hardly "punishing the innocent" to impose a duty of care on Motoring. Indeed, knowing Jewett was at least inclined to B & Es, let alone to rape and attempted murder, how could Motoring be free to ignore with impunity the state's instructions and its own obligation to monitor Jewett's whereabouts during the time he was on its property at the vocational

school? Nonetheless, this is exactly what Motoring did when it let Jewett come and go as he pleased during the class day. The fact that Motoring is open to the public and "did not make it a business to take in inmates" is all the more reason why it should be under a duty to control a dangerous inmate like Jewett that it introduces into a residential community and allows to mix and mingle with its public trainees, employees, and neighbors. As an inmate serving out his time for having committed violent offenses, Jewett, as Motoring well knew, was no honor society student looking to burnish his resume by adding a degree in automobile mechanics to his previous record of accomplishment. It is ironic to note that if Jewett had been applying for work at Motoring as a teacher or a counselor (notwithstanding his background as a child rapist), Motoring would not have been legally privileged to rely simply on an application that admitted an unspecified number of repeated B & Es but potentially failed to disclose the worst part of his history of juvenile offenses. As in *Welsh* a reasonable employer would have been required to check further into the background of such a person, as Motoring failed to do here. *See Welsh*, 474 A.2d at 441 ("we think that background checks in these circumstances should seek relevant information that might not otherwise be uncovered").[13]

---

**12.** *See* Restatement (Second) *Torts* § 318 ("[i]f the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor (a) knows or has reason to know that he has the ability to control the third person, and (b) knows or should know of the necessity and opportunity for exercising such control").

**13.** Employers like Motoring may be directly liable to "third parties who are injured by acts of unfit, incompetent, or unsuitable employees." *Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's Inc.*, 474 A.2d 436, 438 (R.I.1984). In *Welsh*, we noted that the tort of "negligent hiring addresses the risk created by *exposing members of the public to a potentially dangerous*" person. (Emphasis added.) *Id.* at 440 (quoting

*Di Cosala v. Kay*, 91 N.J. 159, 450 A.2d 508 (1982)).

Although several cases guided our analysis in *Welsh* concerning whether employers may be held legally accountable for the wrongful acts of their negligently hired employees, one is particularly instructive. *See id.* at 438–39 (discussing *Ponticas v. K.M.S. Investments*, 331 N.W.2d 907 (Minn.1983)). In *Ponticas* a tenant raped by the manager of her apartment complex sued the owner on the theory that the owner was negligent in hiring the manager, a person on parole following a conviction for burglary and receiving stolen goods. Like Jewett, the manager tried to play down his criminal past by writing on his application that he had been convicted only of traffic violations. The *Ponticas* court held that employers have a duty to exercise reasonable care in selecting persons that could pose a threat to the general public. *See id.* at 438 (discussing *Ponticas* ).

Thus, if Motoring had hired and paid Jewett as an auto-mechanic trainer—instead of getting

Contrary to the majority's assertion, there has been no attempt here to "characterize Motoring as a jailer." However, like any other possessor of land, Motoring was "required to exercise reasonable care, with regard to any activities which [it] carries on, for the protection of those outside of [its] premises." W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 57 at 387 (5th ed. 1984) (citing Restatement (Second) *Torts* § 371). Motoring's possession and control of the property gave it "a power of control over the conduct" of third persons like Jewett, whom Motoring allows to enter, that Motoring is "required to exercise for the protection of those outside." *Id.* at 392.

In these circumstances the failure of the state to request that Motoring provide "custodial services" for the likes of Jewett—that is, inmates that it delivers to private entities in guarded vans while they are still serving out their sentences for having committed violent offenses—is as irrelevant to determining the existence of a duty here as is the failure of the state to request maid services for them. Given Jewett's known status as a juvenile offender who, by his own admission,

had been convicted of an unspecified number of violent crimes, and given his known status as an inmate still in state custody and still serving his sentence for one or more of those offenses, it requires no "leap of logic" to conclude that Motoring had no business relying on the state's blandishments about Jewett being a "highly motivated" individual and allegedly among "the best kids [who were] allowed to utilize this opportunity in terms of working off grounds." [14]

It may be argued that public policy disfavors the imposition of any duty that will discourage private enterprises like Motoring from helping to impart needed job skills to our criminal populace so that these individuals may have the opportunity to become responsible citizens after they have served out their sentences. I am all for such progressive measures, but whatever salutary benefits are to be gained by providing violent juvenile offenders and convicted felons with job training must be balanced against the social cost of allowing them the opportunity to engage in murder and mayhem during their period of attempted rehabilitation.

paid to train him as an auto mechanic—it would be subject to liability under *Welsh* if it negligently allowed him to "fix" the neighbors while he was supposed to be fixing cars. It is anomalous, to say the least, that Motoring's duty of care owed to third parties like these plaintiffs should vanish merely because it is getting paid public money to train Jewett instead of paying him to train others.

14. Moreover, as a matter of fact, Motoring did assume a form of limited "custody" over Jewett when it agreed to train him on its property under an arrangement whereby it was requested to notify the state if he ever left the premises or was absent. As a status defined by the nature of varying relationships, custody can exist on different levels of a continuum. *See* Black's Law Dictionary 384 (6th ed.1990) (the "term is very elastic" and may include the "keeping, guarding, care, watch, inspection, preservation or security of a thing"). Indeed, what constitutes custody is a relative concept, dependent more on the degree of relinquishment of control by an actor over a person or thing and the assumption of responsibility with respect thereto by another actor than any other factors. For example, when patrons leave their jackets with a person who staffs a restaurant's coatroom, they are giving the restaurant custody of their jackets even if they have no intention of leaving them there for more than an hour. Similarly, if these same patrons turn over

their car keys to a valet when they go to the restaurant or attend some other function, they are temporarily relinquishing custody of their vehicles to the control of another who takes responsibility for them during the short time they remain there in the custody of the valet service, garage, or parking lot. Or when they leave their children with a babysitter, the babysitter takes custody of the children for the limited time that they are away. *See Pettery v. Groff*, 491 N.E.2d 583, 585 (Ind.Ct.App.1986) (a babysitter relationship is a custodial one giving rise to a duty of care). The fact that they have not requested any of these custodians to provide custody is immaterial, as is the fact that they hardly intend to relinquish complete control to them or even to give them custody overnight. Similarly, the important fact here is not that the state failed to request Motoring to take custody of Jewett but that in accepting Jewett for training, Motoring knew or should have known that, because of Jewett's incarcerated status and admitted record of violent offenses, the state was not intending, nor was Motoring permitted, to turn Jewett into a free agent after he entered Motoring's premises, allowing him to come and go as he pleased. Indeed, even if the state had expressly told Motoring that this is how it should treat Jewett, Motoring should not thereby be absolved from all liability if it ignored Jewett's admitted violent propensities and simply took him in with no monitoring of or restrictions on his movements.

Any work-release initiatives for adult convicts and off-premises educational and rehabilitative programs for training-school inmates (such as Motoring's ill-fated venture with Jewett) that do not incorporate basic security safeguards to protect the public from violent offenders deserve to come to the "abrupt end" that the majority laments would occur if the participating institutions fail to observe the same duty of care to the public that the state has in these circumstances. Indeed, for all the record discloses, the only reason "[t]his was Motoring's first and last contact with the penal system of the State of Rhode Island" was that it ended in disaster. However, after having been absolved of any duty of care to the public in entering into this type of risky business, Motoring and other such private corporations have now been given the green light to get back into the inmate-training market again with no fear that their security lapses in dealing with such inmates will result in any third-party liability. Unlike the majority, I do not think it is asking too much to impose a duty of reasonable care on those businesses like Motoring that, for a profit, expose their neighbors to the ravages of brutish criminals or violent juvenile offenders while they are supposedly being trained to become more productive members of society.

Finally, it should be noted that we have no evidence in the record of any custom or usage of trade concerning what precautions, if any, are taken by other private vocational-training businesses when they are dealing with inmates of correctional facilities who have known records of violent offenses. But this, too, is of no particular moment in deciding this case. "Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." *The T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.) (L. Hand, J.) *cert. denied,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).

### Conclusion

For these reasons, I would vacate the decision below granting Motoring's summary judgment motion and remand this case to the Superior Court for trial.